## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| UBER TECHNOLOGIES, INC., | Case No. |
| Plaintiff, | |
| v. | **COMPLAINT** |
| LAW GROUP OF SOUTH FLORIDA, LLC, ANDY LOYNAZ, RIVER MEDICAL CENTER, INC., PROFESSIONAL OF SOUTH FLORIDA INC., FLAGLER DIAGNOSTIC CENTER INC., STEVEN BURACK, CASTOR GARCIA SIVERIO, BLANCA BRUZON, NAHIR FRAGA, DIANA MORALES, OSCAR JOSE VALERIO PADILLA, MANOLO LOACES, DANIEL PEREZ DELGADO, YUNIESKY DIAZ VALDIVIE, AND NELSON MOREY GOMEZ, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## TABLE OF CONTENTS

**Page**

SUMMARY OF THE ACTION ................................................................................................ 1

THE PARTIES.......................................................................................................................... 3

JURISDICTION AND VENUE ............................................................................................... 5

FACTUAL BACKGROUND ................................................................................................... 6

I.      THE STAGED ACCIDENT SCHEME .......................................................................... 6

II.     RESULTING FRAUDULENT CLAIMS ...................................................................... 11

      A.     Staged Accident 1 ............................................................................................. 11

      B.     Staged Accident 2 ............................................................................................. 22

      C.     Staged Accident 3 ............................................................................................. 30

      D.     Staged Accident 4 ............................................................................................. 40

      E.     Staged Accident 5 ............................................................................................. 51

III.    RACKETEERING ALLEGATIONS ........................................................................... 54

      A.     Defendants' Respective Roles ......................................................................... 55

      B.     The RICO Enterprise ....................................................................................... 57

      C.     Pattern of Racketeering Activity..................................................................... 61

      D.     Uber Is a Victim of the Scheme and Has Suffered Injury ............................... 62

CAUSES OF ACTION ........................................................................................................... 63

PRAYER FOR RELIEF ......................................................................................................... 88

JURY DEMAND .................................................................................................................... 90

Plaintiff Uber Technologies, Inc. ("Uber"), by its undersigned attorneys, hereby alleges against Defendants Law Group of South Florida, LLC ("Law Group of South Florida"), and Andy Loynaz ("Loynaz") (collectively, the "Law Firm Defendants"); River Medical Center, Inc. ("River Medical Center"), Professional of South Florida Inc. ("Professional of South Florida"), Flagler Diagnostic Center Inc. ("Flagler Diagnostic"), Steven Burack ("Burack"), Castor Garcia Siverio ("Garcia"), Blanca Bruzon ("Bruzon"), Nahir Fraga ("Fraga"), and Diana Morales ("Morales") (collectively, the "Medical Provider Defendants"); and Oscar Jose Valerio Padilla ("Valerio"), Manolo Loaces ("Loaces"), Daniel Perez Delgado ("Perez"), Yuniesky Diaz Valdivie ("Diaz"), and Nelson Morey Gomez ("Morey") (collectively, the "Driver Defendants") as follows:

## SUMMARY OF THE ACTION

1.      Every day, thousands of Floridians rely on Uber's ride-matching services for their transportation needs. Thousands more earn their living by using the Uber application to provide service to others. Each driver and each passenger benefits from reasonable prices and low costs of service. However, its accessibility and widespread popularity have made it a target of a nefarious scheme to misuse the application to trigger insurance coverage and begin a sequence of events leading to sham personal injury claims and lawsuits. The fraudulent conduct of a few bad actors such as those exposed by this suit drives up the cost of the service and threatens harm to all Florida drivers and passengers who benefit from the Uber application.

2.      At the heart of the fraud here are lawyers and medical providers who conspire with staged accident participants to generate an excuse to deliver unnecessary medical care, submit false insurance claims for recovery, and file frivolous lawsuits to sue for non-existent damages. Drivers who use the Uber application are recruited with bribes to stage accidents with cars containing multiple recruited claimants. The drivers and claimants falsely report accidents to the police. They take their cars to designated body shops, and damage is manufactured to create a false

impression that the accidents resulted in injury. The claimants then proceed in tandem on a conveyor belt of medical services, receiving false diagnoses of injury, unnecessary imaging, needless and repetitive delivery of physical therapy, and expensive and unneeded pain injections. The medical providers fraudulently record and bill for these unnecessary procedures. The lawyers cynically use these records and bills to defraud insurance companies and Uber into making payments from which they intend to profit handsomely.

3.     This scheme harms Uber. It harms passengers and the many honest and hard-working drivers who use Uber's application. By promoting criminal activity on the streets and in medical offices of South Florida, the scheme endangers public safety, thereby harming everyone.

4.     The nature of the scheme is described in the examples of staged accidents set forth below. The scheme, however, extends beyond these enumerated accidents, and Uber continues to investigate its scope and extent. To date, however, Uber has identified injuries of several million dollars from defense costs and settlements caused by the scheme.

5.     Uber brings this lawsuit to further its commitment to safety, to promote reasonable pricing for consumers, to deter fraudulent activity on its platform, and to protect the honest drivers who use its platform and their passengers. This case involves outright fraud and a pattern of corrupt and criminal activity including multiple acts of federal wire fraud and mail fraud as well as repeated violations of state laws prohibiting bribery, patient brokering, organized fraud, communications fraud, and insurance fraud. Such conduct can and should be remediated through the tools that Congress created under the federal Racketeer Influenced and Corrupt Organizations Act, or "RICO" statute, 18 U.S.C. §§ 1961, et seq., as well as under the Florida RICO statute, Fla. Stat. §§ 772.103, et seq.

6. This Court has broad power to police the illegal conduct at issue here under these statutes. Uber accordingly seeks relief from this Court to prevent such corrupt activity going forward as well as money damages to compensate it for the harm it has already suffered.

## THE PARTIES

7. Plaintiff Uber is a Delaware corporation with its principal place of business in California.

8. Defendant Law Group of South Florida is a limited liability company duly organized and existing under the laws of the State of Florida. At all relevant times, Law Group of South Florida maintained its principal place of business in Florida.

9. Defendant Loynaz resides in and is a citizen of Florida. At all relevant times, Loynaz was a member of Defendant Law Group of South Florida. He and his firm represented all of the claimants in the staged accidents described below and coordinated the staged accident participants' fraudulent and unnecessary medical treatment in order to pursue false claims and sham litigation against Uber and its commercial auto liability insurance carrier.

10. Defendant River Medical Center is a corporation incorporated under the laws of the State of Florida and is one of the medical practices that carried out the scheme. At all relevant times, River Medical Center maintained its principal place of business in Florida.

11. Defendant Professional of South Florida is a corporation incorporated under the laws of the State of Florida and in coordination with Defendant River Medical Center and Defendant Flagler Diagnostic carried out the scheme by providing fraudulent and medically unnecessary physical therapy treatments for staged accidents as described below. At all relevant times, Defendant Professional of South Florida maintained its principal place of business in Florida.

3

12.     Defendant Flagler Diagnostic is a corporation incorporated under the laws of the State of Florida and is affiliated with Defendant River Medical Center. At all relevant times, Flagler Diagnostic maintained its principal place of business in Florida. Flagler Diagnostic provided fraudulent and medically unnecessary medical treatments for the staged accidents as described below.

13.     Defendant Burack resides in and is a citizen of Florida. Defendant Burack is a licensed osteopathic physician who specializes in pain medicine and carried out the scheme by delivering unnecessary medical treatment and creating false documentation relating thereto. At all relevant times when not incarcerated, Defendant Burack was an employee of Defendant Flagler Diagnostic and provided unnecessary epidural steroid injections for the staged accidents as described below. At the time he gave medically unnecessary injections, he had pled guilty to conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349, for which he was sentenced to 15 months' imprisonment.

14.     Defendant Garcia resides in and is a citizen of Florida. Defendant Garcia is a licensed Advanced Practice Registered Nurse. At all relevant times, Defendant Garcia was an employee of Defendant River Medical Center.

15.     Defendant Bruzon resides in and is a citizen of Florida. Defendant Bruzon is a licensed Advanced Practice Registered Nurse. At all relevant times, Defendant Bruzon was an employee of Defendant River Medical Center.

16.     Defendant Fraga resides in and is a citizen of Florida and at all relevant times was an employee of Defendant River Medical Center. Defendant Fraga is a licensed Advanced Practice Registered Nurse. Together with Defendants Garcia and Bruzon, Defendant Fraga carried out the scheme by falsely certifying the existence of an emergency medical condition, by making false

4

diagnoses of injuries, and by referring claimants to associated medical practices for unnecessary medical treatment.

17.     Defendant Morales resides in and is a citizen of Florida. Defendant Morales is a physical therapist and is licensed as a massage therapist. At all relevant times, Defendant Morales was an employee of Professional of South Florida. As of October 11, 2024, and for some time thereafter, Defendant Morales was a manager of Professional of South Florida.

18.     Defendant Valerio resides in and is a citizen of Florida. Defendant Valerio drove the colliding car in Staged Accident 1, and he drove the lead car in Staged Accident 5.

19.     Defendant Loaces resides in and is a citizen of Florida. Defendant Loaces drove the colliding car in Staged Accident 2.

20.     Defendant Perez resides in and is a citizen of Florida. Defendant Perez drove the colliding car in Staged Accident 3.

21.     Defendant Diaz resides in and is a citizen of Florida. Defendant Diaz drove the colliding car in Staged Accident 4. He was also a passenger in the colliding car in Staged Accident 5.

22.     Defendant Morey resides in and is a citizen of Florida. Defendant Morey drove the colliding car in Staged Accident 5.

23.     These five Driver Defendants were each co-conspirators who misused the Uber driver application to carry out the scheme.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under the federal RICO statute.

25.     This Court also has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interests and costs, exceeds $75,000, and the controversy is between citizens of different states.

26.     This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

27.     Venue is proper pursuant to 28 U.S.C. § 1391 because one or more Defendants reside in the Southern District of Florida and because a substantial amount of the activities forming the basis of this Complaint occurred within the Southern District of Florida.

## FACTUAL BACKGROUND

### I.     THE STAGED ACCIDENT SCHEME

28.     Defendants each advanced a common scheme to profit from staged automobile accidents in the Hialeah area. The scheme involved a pattern of substantially similar staged accidents, manufactured after-the-fact vehicle damage, and unnecessary medical procedures all designed to create false evidence of injury and to fabricate frivolous personal injury claims. Although the scheme was effectuated in part through the filing of sham litigation, it principally involved a wide range of out-of-court corrupt activity, including the creation of false or misleading medical documentation regarding the purported injuries and treatment that allegedly resulted from such staged accidents, the making of false statements to law enforcement officers regarding the cause of the staged accidents, the manufacturing of vehicle damage, and the submission of false or misleading insurance claims requesting payment for such treatment. A chart listing the relevant participants in the scheme, including the participants in the staged accidents specifically described in this Complaint, and a brief description of their respective roles is attached hereto as **Appendix A**.

29.     Although the particulars of this scheme varied from case to case, the essential features remained constant. Participants in the staged accidents were recruited with offers of compensation in exchange for participating in staged accidents and staged medical treatment. Certain co-conspirators agreed to act as drivers of, and passengers in, a "lead car" in a staged accident. Other co-conspirators agreed to serve as the driver of a "colliding car" in the same staged accident. To set the staged accident scheme in motion, the "colliding car" would strike the "lead car" lightly from behind.

30.     The driver of the colliding car used the driver version of the Uber application in order to trigger the available commercial auto liability insurance policy. The two cars then coordinated their actions to stage a fake accident that created a false impression of material damage and personal injury. The driver of the colliding car, while using the Uber application, followed the lead car. The colliding car approached the lead car, touching it gently from behind. The two cars then stopped so that the police could be called to the scene to make a police report.

31.     In most cases, co-conspirator Driver Defendants who drove the colliding cars falsely reported to the police that they caused the collisions because they had looked at their phones and/or the Uber application just before the impact. They did so in furtherance of the scheme to establish their own liability and potential liability against Uber, thereby triggering the applicable insurance policy and manipulating the insurance claim adjusters' liability and value assessment.

32.     The driver of the lead car—and in certain instances the driver of the colliding car—caused their cars to be taken to one of two body shops: King Collision and Yanes Body Shop. At or about the time the cars were taken to the body shops, damage to the cars was manufactured to make the staged accidents look worse than they were, to support the false impression that the staged accident had resulted in material personal injury.

33.     King Collision was the body shop to which the lead cars from Staged Accidents 1, 2, and 5 were taken.

34.     Yanes Body Shop was the body shop to which the colliding car from Staged Accident 1 and the lead cars from Staged Accidents 3 and 4 were taken.

35.     With respect to the staged accidents specifically described in this Complaint, the relationship between the accidents and the body shops is shown in Figure 1 below:



*Figure 1.*

36.     In one case, King Collision admitted to the insurer investigating a claim that some of the damage that the insurer observed upon inspection of the car occurred after King Collision took possession of it.

37.     In some cases, the drivers and passengers of the lead and colliding cars were not strangers. Rather, some of them were already connected to each other prior to the staged accident through a web of personal relationships. For example and as further described below, Driver Defendant Diaz drove the colliding car in Staged Accident 4, and he assumed the role of passenger

in the colliding car in Staged Accident 5. Similarly, Defendant Valerio drove the colliding car in Staged Accident 1, and he drove the lead car in Staged Accident 5.

38.     Figure 2 below shows some of these connections among the co-conspirators:



*Figure 2.*

39.     Following the staged accidents, the drivers and passengers of the lead cars began a series of unnecessary cookie-cutter medical treatments for the purpose of fabricating false claims for payment based on supposed injuries to the lead car drivers and passengers. To induce the claimants' participation in these treatments, the medical providers involved in the scheme paid kickbacks to the claimants directly or indirectly.

40.     As an initial step to maximize recovery from the scheme, claimants visited a diagnostic center that certified a non-existent injury and issued referrals to selected medical providers for further treatment.

41.     First, Defendant River Medical Center generated paperwork falsely representing that the claimants had suffered a serious injury. Typically, a River Medical Center employee involved in intake falsely attested that each claimant suffered an "Emergency Medical Condition."

9

Florida's Motor Vehicle No-Fault Law ("PIP Law") obligates insurers to pay 80% of injured claimants' reasonable expenses for medically necessary services stemming from injuries caused by motor vehicle collisions. Fla. Stat. § 627.736(1)(a). If a qualified medical provider certifies that a claimant suffered an Emergency Medical Condition, the PIP Law's $2,500 payment cap is raised to $10,000. *Id*. § (1)(a)(4).

42.     Second, River Medical Center referred claimants to Professional of South Florida for purported physical therapy treatments. The physical therapy—purportedly delivered by the Defendant Morales—involved essentially identical treatments delivered to the same claimants generally on the same days serving no purpose other than to inflate the resulting claim.

43.     Third, River Medical Center referred the co-conspirator claimants to Flagler Diagnostic for further medical treatment. Flagler Diagnostic's treatment included unnecessary MRI scans and epidural steroid injections which served no legitimate medical purpose.

44.     The medical providers relied on the fact of their separate practices to create a false appearance that these were legitimate medical services. In reality, the medical providers worked together to enrich themselves through fraudulent treatments. They took advantage of their ties and long-standing relationships in doing so. For instance, Defendants River Medical Center and Flagler Diagnostic are located in the same building on the same floor. Defendant River Medical Center shared a billing system with Defendant Professional of South Florida.

45.     Claimants' medical treatment was coordinated by Defendants Loynaz and Law Group of South Florida for the purpose of submitting false claims seeking available insurance and pursuing sham litigation and claims against Uber and its commercial auto liability insurance carrier. A list of the sham lawsuits specifically described in this Complaint is attached hereto as **Appendix B**.

46.     Defendants' conduct violated multiple state and federal statutes including 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), Fla. Stat. § 838.16 (commercial bribery), Fla. Stat. § 817.505 (prohibiting patient brokering), Fla. Stat. § 817.034(4)(a) (prohibiting organized fraud), Fla. Stat. § 817.034(4)(b) (prohibiting communications fraud), Fla. Stat. § 817.234(1)(a) (prohibiting insurance fraud), Fla. Stat. § 817.234(2)(a) (prohibiting insurance fraud for medical practitioners), Fla. Stat. § 817.234(8)(a) (prohibiting fraud in connection with motor vehicle accident claims), and Fla. Stat. § 817.234(9) (prohibiting staging motor vehicle collisions for the purpose of making tort or insurance claims). For the reasons discussed below, such conduct constituted an actionable pattern of racketeering activity and criminal activity under the federal and state RICO statutes.

47.     Defendants carried out this pattern of fraudulent and corrupt activity against Uber and others in a number of staged accidents, including but not limited to each of the following:

## II.     RESULTING FRAUDULENT CLAIMS

### A.     Staged Accident 1

48.     Staged Accident 1 occurred on September 4, 2023, at approximately 9:00 p.m. As with each of the other staged accidents in the scheme, Staged Accident 1 was planned in advance.

49.     Three co-conspirators occupied the lead car: a driver and two passengers. Roberto Fleites Ruiz ("Fleites") drove the lead car. His passengers were Luis Miguel Rodriguez Aragon ("Rodriguez") and Carlos Rafael Suarez Lorenzo ("Suarez"). Defendant Valerio drove the colliding car.

50.     Evidencing the conspiracy, several months after Defendant Valerio drove the colliding car in Staged Accident 1, he also drove the lead car in Staged Accident 5 described below.

51.     Shortly after Staged Accident 1 occurred, the police attended to the drivers and passengers. Defendant Valerio told the police that "he was picking up something that fell on the

floor of his car … and admitted to fault of the accident." Upon information and belief, this statement was knowingly false when made. Defendant Valerio made this false statement for the purpose of triggering the available insurance policy.

52.     The police prepared a report. It noted no injuries and described only minor damage to both cars. Specifically, the report listed "Injury Severity" as "None" for each participant in the staged accident and stated that "both parties refused fire rescue." The police report listed "Extent of Damage" as "Minor" for both cars. The police report further stated that airbags were "Not Deployed" in either car.

53.     Following Staged Accident 1, the driver of the colliding car (Defendant Valerio) took his car to Yanes Body Shop. After the staged accident, damage was manufactured for the purpose of supporting false claims of injury. For example, after the colliding car arrived at Yanes Body Shop, its airbags were deployed, whereas they had not been deployed at the scene of Staged Accident 1, according to the police report.

54.     Photographs of the colliding car taken immediately following Staged Accident 1, on the one hand, and after it was taken to Yanes Body Shop, on the other hand, show the manufactured damage:



*Figure 3.*

55.     The lead car was similarly damaged after the fact. The driver of that car (Fleites) took his car to King Collision. Damage was manufactured for the purpose of supporting false claims of personal injury. Notably, at the time of Staged Accident 1, a passenger in the lead car, Suarez, was living in the same house as King Collision's owner and manager.

56.     Following the purported accident, the driver and passengers of the lead car (Fleites, Rodriguez, and Suarez) went to River Medical Center for fraudulent and medically unnecessary treatment of their non-existent injuries. Such medical treatment was coordinated by the Law Group of South Florida, which was listed as a payor on certain resulting health insurance claim forms.

57.     As with each of the other staged accidents in the scheme, the driver of the colliding car—Defendant Valerio—logged into the Uber application before and during the collision in order to trigger the available commercial auto liability insurance policy and further the scheme to defraud. That same day, Defendant Valerio used the Uber application to report the staged accident to Uber again in furtherance of the scheme. Valerio was a knowing participant in such scheme and agreed to further its aims. Each such use of the Uber application by Valerio was a reasonably

foreseeable use of interstate wires in furtherance of the scheme and therefore constitutes a separate violation of the federal wire fraud statute (18 U.S.C. § 1343).

58.     On September 5 and 6, 2023, and in furtherance of the scheme, Defendant Bruzon of River Medical Center executed Notices of Emergency Medical Condition for Rodriguez and Fleites falsely attesting for each of them that "the patient has sustained acute symptoms of sufficient severity, which may include sever [sic] pain, such that the absence of immediate medical attention could reasonably be expected to result in any of the following: serious impairment to bodily functions or serious dysfunctions of a bodily organ or part."

59.     Upon information and belief, Defendant Bruzon knew or acted with reckless indifference to the fact that these statements were false when made, given that Rodriguez and Fleites had suffered no such injury. The false certification was made for the purpose of extracting additional medical expenses from an insurer under the PIP Law and to increase the value of a fraudulent claim against Uber. It was reasonably foreseeable to Defendant Bruzon that such false statements would be subsequently sent by U.S. mail or private or commercial carrier and transmitted through the interstate wires to the Law Group of South Florida for further transmission by interstate wires to an insurance carrier. Such records were in fact so mailed and transmitted. As such, each such notice was executed in violation of the federal mail and wire fraud statutes (18 U.S.C. §§ 1341, 1343).

60.     To increase the amount of the claim and in furtherance of the scheme, Defendant Bruzon referred Fleites and Rodriguez to Professional of South Florida for fraudulent and medically unnecessary physical therapy. Fleites and Rodriguez both received this physical therapy from Defendant Morales. In coordinated fashion, Fleites and Rodriguez typically visited Professional of South Florida for physical therapy on the same day. Over the ensuing two months,

14

Fleites and Rodriguez attended such physical therapy sessions on the same day on September 7, 12, 13, 14, 15, 18, 19, 20, 21, 22, 25, and 26 and October 2, 4, 5, 9, 10, 13, 17, 18, 20, 23, 24, and 25.

61.     The treatment delivered was unnecessary and had no connection to claimants' supposed injuries. Fleites was on the driver's side of the lead vehicle, and Rodriguez was on the passenger's side. They reported different supposed injuries, and yet the treatments they received were substantially the same. Further, their reported pain started at implausibly high levels and dropped in lockstep over time:

| Joint Visit Dates | Reported Pain Level | | Treatments | |
|---|---|---|---|---|
| | Fleites | Rodriguez | Fleites | Rodriguez |
| 9/7/2023 | 8 | 8 | Therapeutic Procedure (2) Contrast Bath (1) EMS (1) Neuro Muscular Re-ed (2) Ultrasound (1) Mechanical Traction (1) Self-Care/Home Management (1) | Therapeutic Procedure (2) Contrast Bath (1) EMS (1) Neuro Muscular Re-ed (2) Ultrasound (1) Mechanical Traction (1) |
| 9/12/2023 | 8 | 8 | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Ultrasound (1) Mechanical Traction (1) Contrast Bath (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Ultrasound (1) Mechanical Traction (1) Hot/Cold Packs (1) |
| 9/13/2023 | 8 | 8 | Therapeutic Procedure (2) Cold Laser Therapy (1) Neuro Muscular Re-ed (2) Ultrasound (1) Mechanical Traction (1) Contrast Bath (1) | Therapeutic Procedure (2) Cold Laser Therapy (1) Neuro Muscular Re-ed (2) Ultrasound (1) Mechanical Traction (1) Hot/Cold Packs (1) |
| 9/14/2023 | 8 | 7-8 | Therapeutic Procedure (2) Contrast Bath (1) EMS (1) Neuro Muscular Re-ed (2) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) Contrast Bath (1) EMS (1) Neuro Muscular Re-ed (2) Ultrasound (1) Mechanical Traction (1) |

| Joint Visit Dates | Reported Pain Level | | Treatments | |
|---|---|---|---|---|
| | Fleites | Rodriguez | Fleites | Rodriguez |
| 9/15/2023 | 8 | 7-8 | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) |
| 9/18/2023 | 8 | 7-8 | Therapeutic Procedure (2) Contrast Bath (1) Cold Laser Therapy (1) Neuro Muscular Re-ed (2) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) Contrast Bath (1) EMS (1) Manual Therapy (2) Ultrasound (1) Mechanical Traction (1) |
| 9/19/2023 | 8 | 7-8 | Therapeutic Procedure (2) Contrast Bath (1) EMS (1) Neuro Muscular Re-ed (2) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) Hot/Cold Packs (1) EMS (1) Manual Therapy (2) Ultrasound (1) Paraffin Bath (1) |
| 9/20/2023 | 8 | 7-8 | Therapeutic Procedure (2) Contrast Bath (1) Cold Laser Therapy (1) Neuro Muscular Re-ed (2) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) Cold Laser Therapy (1) Hold/Cold Packs (1) Manual Therapy (2) Ultrasound (1) Mechanical Traction (1) |
| 9/21/2023 | 8 | 7-8 | Therapeutic Procedure (2) Contrast Bath (1) EMS (1) Neuro Muscular Re-ed (2) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Manual Therapy (2) Hold/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) |
| 9/22/2023 | 8 | 7-8 | Therapeutic Procedure (2) Contrast Bath (1) Cold Laser Therapy (1) Neuro Muscular Re-ed (2) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Manual Therapy (2) Hold/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) |

| Joint Visit Dates | Reported Pain Level | | Treatments | |
|---|---|---|---|---|
| | Fleites | Rodriguez | Fleites | Rodriguez |
| 9/25/2023 | 7-8 | 7-8 | Therapeutic Procedure (2)<br>Contrast Bath (1)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Ultrasound (1)<br>Mechanical Traction (1) | Therapeutic Procedure (2)<br>EMS (1)<br>Manual Therapy (2)<br>Hold/Cold Packs (1)<br>Ultrasound (1)<br>Mechanical Traction (1) |
| 9/26/2023 | 7 | 7 | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Mechanical Traction (1) | Therapeutic Procedure (2)<br>EMS (1)<br>Manual Therapy (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Mechanical Traction (1) |
| 10/2/2023 | 6-7 | 6-7 | Therapeutic Procedure (2)<br>Self-Care/Home Management (1)<br>Contrast Bath (1)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Ultrasound (1) | Therapeutic Procedure (2)<br>Self-Care/Home Management (1)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Ultrasound (1)<br>Hot/Cold Packs (1) |
| 10/4/2023 | 6-7 | 6-7 | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Mechanical Traction (1) | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Mechanical Traction (1) |
| 10/5/2023 | 6-7 | 6-7 | Therapeutic Procedure (2)<br>EMS (1)<br>Contrast Bath (1)<br>Neuro Muscular Re-ed (2)<br>Ultrasound (1)<br>Mechanical Traction (1) | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Paraffin Bath (1) |
| 10/9/2023 | 6-7 | 6-7 | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Ultrasound (1)<br>Mechanical Traction (1)<br>Contrast Bath (1) | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Ultrasound (1)<br>Mechanical Traction (1)<br>Hot/Cold Packs (1) |

| Joint Visit Dates | Reported Pain Level | | Treatments | |
|---|---|---|---|---|
| | Fleites | Rodriguez | Fleites | Rodriguez |
| 10/10/2023 | 6-7 | 6-7 | Therapeutic Procedure (2)<br>Cold Laser Therapy (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Mechanical Traction (1) | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Mechanical Traction (1) |
| 10/13/2023 | 6-7 | 6-7 | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Mechanical Traction (1) | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Paraffin Bath (1) |
| 10/17/2023 | 6-7 | 6-7 | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Mechanical Traction (1) | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Mechanical Traction (1) |
| 10/18/2023 | 6-7 | 6-7 | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Ultrasound (1)<br>Mechanical Traction (1)<br>Contrast Bath (1) | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Ultrasound (1)<br>Mechanical Traction (1)<br>Hot/Cold Packs (1) |
| 10/20/2023 | 6 | 6-7 | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Ultrasound (1)<br>Mechanical Traction (1)<br>Contrast Bath (1) | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Ultrasound (1)<br>Paraffin Bath (1)<br>Hot/Cold Packs (1) |
| 10/23/2023 | 6 | 6 | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Mechanical Traction (1) | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Mechanical Traction (1) |

| Joint Visit Dates | Reported Pain Level | | Treatments | |
|---|---|---|---|---|
| | Fleites | Rodriguez | Fleites | Rodriguez |
| 10/24/2023 | 6 | 6 | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Mechanical Traction (1) | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Mechanical Traction (1) |
| 10/25/2023 | 6 | 6 | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Ultrasound (1)<br>Mechanical Traction (1)<br>Contrast Bath (1) | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Ultrasound (1)<br>Mechanical Traction (1)<br>Hot/Cold Packs (1) |

62.    With respect to each claimant and each visit, Defendant Morales signed a separate record memorializing such pain levels and treatments. Upon information and belief, Defendant Morales knew or acted with reckless indifference to the fact that these stated pain levels were false, given that Rodriguez and Fleites had suffered no injury, and that treatments were unnecessary and were for the purpose of fabricating a claim. It was reasonably foreseeable to Defendant Morales that such false statements would be subsequently sent by U.S. mail or private or commercial carrier and transmitted through the interstate wires to the Law Group of South Florida for further transmission by interstate wires to an insurance carrier. Such records were in fact so mailed and transmitted. As such, each such record was prepared and executed in violation of the federal mail and wire fraud statutes (18 U.S.C. §§ 1341, 1343).

63.    Apart from physical therapy, Defendant Bruzon also referred Fleites and Rodriguez to Defendant Flagler Diagnostic for medical treatment. Defendant Flagler Diagnostic is associated with Defendant River Medical Center and is located on the same floor of the same building.

64.     At Defendant Flagler Diagnostic, Fleites and Rodriguez each received steroid injections administered by Defendant Burack on January 17, 2024. Suarez also received a steroid injection from Defendant Burack on January 25, 2024. Each of these steroid injections were fraudulent and medically unnecessary because Fleites, Rodriguez, and Suarez had suffered no injury in Staged Accident 1. Nevertheless, in furtherance of the scheme and for the purpose of adding the expense of such injections to their false claims, Defendant Burack falsely represented with respect to Fleites, Rodriguez, and Suarez: "The etiology of the pain is believed to be as result of the above listed trauma [*i.e.*, the staged accident]." Upon information and belief, Defendant Burack knew or acted with reckless indifference to the fact that the statement was false when made given that these claimants had suffered no such trauma. It was reasonably foreseeable to Defendant Burack that such false statements would be subsequently sent by U.S. mail or private or commercial carrier and transmitted through the interstate wires to Defendant Law Group of South Florida for further transmission by interstate wires to an insurance carrier. Such records were in fact so mailed and transmitted. As such, each such statement was made in violation of the federal mail and wire fraud statutes (18 U.S.C. §§ 1341, 1343).

65.     On April 4, 2024, and in furtherance of the scheme, Defendant Law Group of South Florida faxed three letters signed by Defendant Loynaz to the insurance company for the driver of the colliding car, a single limit policy that also insured Uber and its subsidiaries. Each letter demanded payment of the full amount of the available insurance policy limits ($1 million) to resolve the respective claims for Fleites, Rodriguez, and Suarez. The letters falsely represented as follows:

> There are no issues of causation in this case. Following the crash, [each claimant] was treated at Larkin Community Hospital, Roberto Comperetore, Lakes Radiology, The Medical City Advanced Diagnostic Center, Flagler Diagnostic Center, Professional South

20

Florida [sic] and River Medical Center for the significant injuries suffered as a direct and proximate cause of the violent impact from the crash. The medical records clearly show that the nature of their injuries is consistent with the violent impact in this crash. Thus, the causal connection between the crash and the injuries claimed are evident and well documented.

66.     Upon information and belief, Defendant Loynaz and Defendant Law Group of South Florida knew or acted with reckless indifference to the fact that such statements were false when made. Among other things, they were aware of the staged nature of the accident, coordinated the unnecessary medical treatment, and had offered to stand as payor for such treatment. Apart from the transmission of such demand, it was also reasonably foreseeable to Defendant Loynaz and his firm that the Driver Defendant utilized interstate wires in the ordinary course of business in connection with the staged accident as described above. Such uses of interstate wires constituted a violation of the federal wire fraud statute (18 U.S.C. § 1343). Further, because the medical records upon which this false claim was based were solicited by and delivered to Defendant Loynaz and Defendant Law Group of South Florida by U.S. mail or private or commercial carrier, such conduct also constituted a violation of the federal mail fraud statute (18 U.S.C. § 1341).

67.     On May 22, 2024, the Law Group of South Florida electronically filed a sham lawsuit signed by Defendant Loynaz against Uber and others seeking recoveries for these claimants' phony injuries stemming from Staged Accident 1. This lawsuit is captioned *Fleites v. Valerio Padilla*, No. 2024-009400-CA-01 (Fla. 11th Cir. Ct.). Although the fraudulent scheme occurred outside of the litigation, the use of the interstate wires to file the lawsuit was also in furtherance of the scheme and in violation of the federal wire fraud statute (18 U.S.C. § 1343).

68.     The Law Group of South Florida continues to prosecute this case even though it knows or is recklessly indifferent to the fact that the claimants were not injured in Staged Accident

1. Uber has suffered, and continues to suffer, substantial costs defending against the fraudulent allegations as a result of this scheme.

**B.      Staged Accident 2**

69.      A substantially similar staged accident occurred on September 18, 2023, at approximately 10:56 p.m. As with each of the other staged accidents in the scheme, Staged Accident 2 was fraudulently planned in advance.

70.      Three co-conspirators occupied the lead car in Staged Accident 2. The driver of the lead car was Dany Arencibia Cruz ("Arencibia"). His two passengers were Carolina Correa ("Correa") and Emilio Mederos ("Mederos"). Mederos has been convicted of multiple crimes under Florida law, including attaching an unassigned license plate to a vehicle, grand theft of the third degree, and petit theft of the first degree.

71.      The colliding car was driven by Driver Defendant Loaces.

72.      After Staged Accident 2 occurred, police officers were called to the scene. The police report noted no injuries, minor damage to the vehicles, and no airbag deployment.

73.      Following Staged Accident 2, the lead car was taken to King Collision. Thereafter, additional damage to the car was manufactured for the purpose of supporting fraudulent claims of personal injury. Photographs of the vehicle taken immediately following the staged accident and after it was taken to King Collision show the manufactured damage:



*Figure 4.*



*Figure 5.*

74.     In addition, after the lead car was taken to King Collision, the airbags were fraudulently deployed to exaggerate the impact of Staged Accident 2. A forensic investigation confirmed that the lead car's airbags did not deploy as a result of Staged Accident 2.

75.     As with each of the other staged accidents in the scheme, the driver of the colliding car, Defendant Loaces, logged into the Uber application before and during the collision in order to trigger the available commercial auto liability insurance policy and further the scheme to defraud. After Staged Accident 2 occurred, in furtherance of the scheme, Defendant Loaces again used the Uber application to report the staged accident to Uber in furtherance of the scheme. Defendant Loaces was a knowing participant in such scheme and agreed to further its aims. Each such use of the Uber application by Defendant Loaces was a reasonably foreseeable use of interstate wires in furtherance of the scheme and therefore constitutes a separate violation of the federal wire fraud statute (18 U.S.C. § 1343).

76.     The driver and passengers of the lead car each went to River Medical Center for purported treatment of their non-existent injuries at the direction of Defendant Loynaz.

77.     On September 19 and 21, 2023, and October 2, 2023, Defendants Bruzon, Fraga, and Garcia respectively signed Notices of Emergency Medical Condition for the lead car driver, Arencibia, and the two passengers, Correa and Mederos. Each notice falsely attested that "the patient has sustained acute symptoms of sufficient severity, which may include sever [sic] pain, such that the absence of immediate medical attention could reasonably be expected to result in any of the following: serious impairment to bodily functions or serious dysfunctions of a bodily organ or part."

78.     Upon information and belief, Defendants Bruzon, Fraga, and Garcia each knew or acted with reckless indifference to the fact that these statements were false when made, given that

Arencibia, Correa, and Mederos had suffered no such injury. The false certifications were made for the purpose of extracting additional medical expenses from an insurer under the PIP Law and to increase the value of a fraudulent claim against Uber. It was reasonably foreseeable to Defendants Bruzon, Fraga, and Garcia that such false statements would be subsequently sent by U.S. mail or private or commercial carrier and transmitted through the interstate wires to the Law Group of South Florida for further transmission by interstate wires to an insurance carrier. Such records were in fact so mailed and transmitted. As such, each such notice was executed in violation of the federal mail and wire fraud statutes (18 U.S.C. §§ 1341, 1343).

79.     Defendants Bruzon, Fraga, and Garcia referred Arencibia, Correa, and Mederos to Professional of South Florida for fraudulent and medically unnecessary physical therapy. In each instance, Arencibia, Correa, and Mederos received physical therapy from Defendant Morales, the same therapist who treated Fleites and Suarez following Staged Accident 1.

80.     Over the months that followed and in coordinated fashion, Arencibia, Correa, and Mederos traveled to Professional of South Florida for numerous physical therapy sessions. As with the treatment following Staged Accident 1, Arencibia, Correa, and Mederos reported nearly identical false pain levels to and received nearly the same treatment from Professional of South Florida. On 26 separate occasions, two of these three co-conspirators received nearly identical physical therapy treatments from Defendant Morales on the same day. On eight occasions, Arencibia, Correa, and Mederos each received nearly identical treatments on the same day from Defendant Morales. These treatments typically included electrical muscle stimulation, cold packs, ultrasound therapy, and neuromuscular re-education therapy, and were accompanied by nearly identical pain levels, which started at implausibly high levels and dropped in tandem over time.

The following chart illustrates the treatments received when each of the three claimants attended on the same day:

| Joint Visit Dates | Reported Pain Levels | | | Treatments | | |
|---|---|---|---|---|---|---|
| | Arencibia | Correa | Mederos | Arencibia | Correa | Mederos |
| 10/3/2023 | 8 | 7-8 | 8 | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Paraffin Bath (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Self-Care/Home Management ADL (1) |
| 10/4/2023 | 8 | 7-8 | 8 | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Paraffin Bath (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) |
| 10/9/2023 | 6-7 | 7 | 8 | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) |
| 10/10/2023 | 6-7 | 7 | 8 | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Paraffin Bath (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) |
| 10/17/2023 | 6 | 5-6 | 7 | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Paraffin Bath (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Self-Care/Home Management ADL (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) |

| Joint Visit Dates | Reported Pain Levels | | | Treatments | | |
|---|---|---|---|---|---|---|
| | Arencibia | Correa | Mederos | Arencibia | Correa | Mederos |
| 10/18/2023 | 6 | 5-6 | 7 | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) |
| 10/20/2023 | 5-6 | 5-6 | 6-7 | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) |
| 11/7/2023 | 5-6 | 5-6 | 6 | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Paraffin Bath (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Self-Care/Home Management ADL (1) |

81.     With respect to each claimant and each visit, Defendant Morales signed a separate

record memorializing such pain levels and treatments. Upon information and belief, Defendant

Morales knew or acted with reckless indifference to the fact that these stated pain levels were false,

given that Arencibia, Correa, and Mederos had suffered no injury, and that the treatments were

unnecessary and were for the purpose of fabricating a claim. It was reasonably foreseeable to

Defendant Morales that such false statements would be subsequently sent by U.S. mail or private

or commercial carrier and transmitted through the interstate wires to the Law Group of South

Florida for further transmission by interstate wires to an insurance carrier. Such records were in

fact so mailed and transmitted. As such, each such record was prepared and executed in violation

of the federal mail and wire fraud statutes (18 U.S.C. §§ 1341, 1343).

82.     Showing the coordination of treatment within the broader conspiracy, fourteen of the physical therapy sessions attended on the same day by at least two of Arencibia, Correa, and Mederos occurred on the same day as physical therapy sessions attended by Fleites and Rodriguez in connection with Staged Accident 1 (September 22 and 25 and October 2, 4, 5, 9, 10, 13, 17, 18, 20, 23, 24, and 25).

83.     As in Staged Accident 1 and in furtherance of the scheme, Defendant River Medical Center referred Arencibia, Correa, and Mederos to Defendant Flagler Diagnostic for MRIs and medical treatment. Defendant Law Group of South Florida was listed as a payor on the resulting health insurance claim forms issued by that practice.

84.     On January 17, 2024, Defendant Burack administered steroid injections to Arencibia. This was the very same day on which Defendant Burack administered the same injections to Fleites and Rodriguez in connection with Staged Accident 1.

85.     On January 25, 2024, Defendant Burack administered a steroid injection to Correa. This was on the same day that he administered the same injection to Suarez in connection with Staged Accident 1.

86.     Each of these steroid injections was medically unnecessary given that Arencibia and Correa had suffered no injury. For the purpose of adding the expense of such injections to their personal injury claims, Defendant Burack falsely represented with respect to Arencibia and Correa: "The etiology of the pain is believed to be as result of the above listed trauma [*i.e.*, the staged accident]." Upon information and belief, Defendant Burack knew or acted with reckless indifference to the fact that the statement was false when made given that these claimants had suffered no such trauma. It was reasonably foreseeable to Defendant Burack that such false statements would be subsequently sent by U.S. mail or private or commercial carrier and

28

transmitted through the interstate wires to Defendant Law Group of South Florida for further transmission by interstate wires to an insurance carrier. Such records were in fact so mailed and transmitted. As such, each such statement was made in violation of the federal mail and wire fraud statutes (18 U.S.C. §§ 1341, 1343).

87.    On February 27, 2024, and in furtherance of the scheme, Defendant Law Group of South Florida faxed three letters signed by Defendant Loynaz to the insurance company for the driver of the colliding car, a single limit policy that also insured Uber and its subsidiaries. Each letter demanded payment of the full amount of the available insurance policy limits ($1 million) to resolve each of the respective claims of Arencibia, Correa, and Mederos. The letters falsely represented as follows:

> There are no issues of causation in this case. Following the incident, [each claimant] started receiving treatments at Flagler Diagnostic Center, Professional South Florida [sic] and River Medical Center. [sic] for their injuries suffered as a direct cause from this accident[.] Our clients were treated for the significant injuries suffered as a direct and proximate cause of the violent impact from the incident.

88.    Upon information and belief, Defendant Loynaz and Defendant Law Group of South Florida knew or acted with reckless indifference to the fact that such statements were false when made. Among other things, they were aware of the staged nature of the accident, had been responsible for coordinating the unnecessary medical treatment, and had offered to stand as payor for such treatment. Apart from the transmission of such demands, it was also reasonably foreseeable to Defendant Loynaz and his firm that the Driver Defendant Loaces utilized interstate wires in the ordinary course of business in connection with the staged accident as described above. Such uses of interstate wires constituted violations of the federal wire fraud statute (18 U.S.C. § 1343). Further, because the medical records upon which these false claims were based were solicited by and delivered to Defendant Loynaz and Defendant Law Group of South Florida by

U.S. mail or private or commercial carrier, such conduct also constituted a violation of the federal mail fraud statute (18 U.S.C. § 1341).

89.     On May 28, 2024, Defendant Law Group of South Florida electronically filed a sham lawsuit signed by Defendant Loynaz against Uber and others seeking recoveries on behalf of Arencibia, Correa, and Mederos in connection with Staged Accident 2. This lawsuit was captioned *Arencibia Cruz v. Loaces*, No. 2024-009733-CA-01 (Fla. 11th Cir. Ct.). Although the fraudulent scheme occurred outside of the litigation, the use of the interstate wires to file the lawsuit was also in furtherance of the scheme and in violation of the federal wire fraud statute (18 U.S.C. § 1343).

90.     After filing their sham lawsuit, Defendants Loynaz and Law Group of South Florida stopped representing Mederos, the convicted felon. His claim was instead referred to separate counsel, Xenia Hernandez. As of April 25, 2025, Xenia Hernandez has been suspended from the practice of law in Florida for misappropriation of client funds, use of client funds for her own benefit or the benefit of her firm, improper disbursements for a client using other clients' funds, and shortages in her trust account ranging from at least approximately $169,000 to $381,000.

91.     Defendants Loynaz and the Law Group of South Florida continue to prosecute a sham lawsuit arising from Staged Accident 2. Uber has suffered, and continues to suffer, substantial costs as a result of defending against the fraudulent allegations as a result of this scheme.

### C.     Staged Accident 3

92.     Staged Accident 3 occurred on November 28, 2023, at approximately 9:54 p.m. As with each of the other staged accidents in the scheme, Staged Accident 3 was planned in advance.

93.     Defendant Perez drove the colliding car.

94.     Four co-conspirators occupied the lead car. Diosvany Iriarte Blanco ("Iriarte") drove that lead car. His three passengers were Liday Morejon Collazo ("Morejon"), Ania Clemente ("Clemente"), and Yutmila Yamiraky Gutierrez Camejo ("Gutierrez").

95.     These individuals were connected to other scheme participants. Among other things, Iriarte lived at the same address as the person who had previously owned the colliding car in Staged Accident 4. That owner had sold his vehicle to Defendant Diaz (the driver of that colliding car) only two months before Staged Accident 4. The owner of the colliding car in Staged Accident 3 is Iriarte's sister and is or was the partner of Defendant Perez.

96.     After Staged Accident 3 occurred, the police were called to the scene.

97.     The police report noted that Iriarte "complained of back pain but refused Fire Rescue." Otherwise, the police report noted no injuries and described only minor damage to the cars.

98.     Following the accident, the lead car was taken to Yanes Body Shop. As with the lead car in the other staged accidents, additional damage was manufactured for the purpose of supporting false claims for payment:



*Figure 6.*

99.     As with each of the other staged accidents in the scheme, the driver of the colliding car, Defendant Perez, logged into the Uber application before and during the collision in order to trigger the available commercial auto liability insurance policy and further the scheme to defraud. After Staged Accident 3 occurred, Defendant Perez again used the Uber application to report the staged accident to Uber in furtherance of the scheme. Defendant Perez was a knowing participant in such scheme and agreed to further its aims. Each such use of the Uber application by Defendant Perez was a reasonably foreseeable use of interstate wires in furtherance of the scheme and therefore constitutes a separate violation of the federal wire fraud statute (18 U.S.C. § 1343).

100.    As in Staged Accidents 1 and 2, the driver of the lead car (Iriarte) and his passengers (Morejon, Clemente, and Gutierrez) traveled to Defendant River Medical Center for fraudulent diagnoses and referrals. Such medical care was coordinated by Defendant Loynaz and Defendant Law Group of South Florida.

101. On November 29, 2023, and December 4 and 8, 2023, Defendant Fraga of Defendant River Medical Center executed Notices of Emergency Medical Condition for Iriarte, Clemente, and Gutierrez falsely attesting that "the patient has sustained acute symptoms of sufficient severity, which may include sever [sic] pain, such that the absence of immediate medical attention could reasonably be expected to result in any of the following: serious impairment to bodily functions or serious dysfunctions of a bodily organ or part."

102. On December 1, 2023, Defendant Bruzon executed a nearly identical Notice of Emergency Medical Condition for Morejon with the same false attestations.

103. Upon information and belief, Defendants Fraga and Bruzon knew or acted with reckless indifference to the fact that such statements were false when made, given that Iriarte, Clemente, Gutierrez, and Morejon had in fact suffered no such injury. The false certifications were made for the purpose of extracting additional medical expenses from an insurer under the PIP Law and to increase the value of a fraudulent claim against Uber. It was reasonably foreseeable to Defendants Fraga and Bruzon that such false statements would be subsequently sent by U.S. mail or private or commercial carrier and transmitted through the interstate wires to the Law Group of South Florida for further transmission by interstate wires to an insurance carrier. Such records were in fact so mailed and transmitted. As such, each such notice was executed in violation of the federal mail and wire fraud statutes (18 U.S.C. §§ 1341, 1343).

104. To increase the amount of the claims, Defendant Fraga and Defendant Bruzon referred Iriarte, Morejon, Clemente, and Gutierrez to Defendant Professional of South Florida for unnecessary therapy. Again, these co-conspirators received such therapy from Defendant Morales.

105. As with the other staged accidents, these claimants frequently received physical therapy treatment from Defendant Morales on the same days. Over the ensuing two months, all

four claimants attended such sessions on the same day on 18 occasions. On 10 other occasions, three of the four claimants attended such sessions on the same day. On six other occasions, two of the four claimants attended such sessions on the same day. All told, out of 120 total therapy sessions among the four claimants, 95% of the sessions occurred on days when at least one other claimant had a session.

106.   On these occasions—notwithstanding their different ages, heights, weights, preexisting physical conditions, and locations in the lead car at the time of the staged accident—Iriarte, Morejon, Clemente, and Gutierrez received nearly identical physical therapy treatments and made substantially similar false statements concerning their pain levels. A chart showing the treatments received on the days when all four claimants attended on the same day is as follows:

| Joint Visit Dates | Reported Pain | | | | Treatments | | | |
|---|---|---|---|---|---|---|---|---|
| | Iri-art e | Mo re-jon | Cle me nte | Gu tier rez | Iriarte | Morejon | Clemente | Gutierrez |
| 12/11/23 | 7-8 | 7-8 | 8 | 8 | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Paraffin Bath (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Self-Care/Home Management ADL (1) |
| 12/12/23 | 7-8 | 7-8 | 8 | 8 | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Paraffin Bath (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) |

| Joint Visit Dates | Reported Pain | | | | Treatments | | | |
|---|---|---|---|---|---|---|---|---|
| | Iriarte | Morejon | Clemente | Gutierrez | Iriarte | Morejon | Clemente | Gutierrez |
| 12/13/23 | 6-7 | 7-8 | 8 | 8 | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Paraffin Bath (1) |
| 12/19/23 | 6-7 | 7-8 | 8 | 8 | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Paraffin Bath (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Paraffin Bath (1) |
| 12/20/23 | 6-7 | 7-8 | 8 | 7-8 | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) |
| 12/21/23 | 6-7 | 7-8 | 8 | 7-8 | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Paraffin Bath (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) |
| 12/22/23 | 6-7 | 7-8 | 8 | 7-8 | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Paraffin Bath (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) |

| Joint Visit Dates | Reported Pain | | | | Treatments | | | |
|---|---|---|---|---|---|---|---|---|
| | Iriarte | Morejon | Clemente | Gutierrez | Iriarte | Morejon | Clemente | Gutierrez |
| 12/26/23 | 6-7 | 7-8 | 7-8 | 7-8 | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Paraffin Bath (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Paraffin Bath (1) |
| 1/09/24 | 5-6 | 6 | 6 | 6 | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Paraffin Bath (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Self-Care/Home Management ADL (1) |
| 1/10/24 | 5-6 | 6 | 6 | 6 | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Paraffin Bath (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) |
| 1/12/24 | 5-6 | 6 | 6 | 6 | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Paraffin Bath (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Paraffin Bath (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Paraffin Bath (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Paraffin Bath (1) |

| Joint Visit Dates | Reported Pain | | | | Treatments | | | |
|---|---|---|---|---|---|---|---|---|
| | Iriarte | Morejon | Clemente | Gutierrez | Iriarte | Morejon | Clemente | Gutierrez |
| 1/16/24 | 5-6 | 5-6 | 5-6 | 5-6 | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Paraffin Bath (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Paraffin Bath (1) |
| 1/17/24 | 5-6 | 6 | 5-6 | 5-6 | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Paraffin Bath (1) |
| 1/18/24 | 5-6 | 6 | 5-6 | 5-6 | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Paraffin Bath (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) |
| 1/19/24 | 5-6 | 5-6 | 5-6 | 5-6 | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-d (2) Ho Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Paraffin Bath (1) |

| Joint Visit Dates | Reported Pain | | | | Treatments | | | |
|---|---|---|---|---|---|---|---|---|
| | Iriarte | Morejon | Clemente | Gutierrez | Iriarte | Morejon | Clemente | Gutierrez |
| 1/22/24 | 5-6 | 5-6 | 5-6 | 5-6 | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Paraffin Bath (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) |
| 1/23/24 | 5-6 | 5-6 | 5-6 | 5-6 | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Paraffin Bath (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) |
| 1/24/24 | 5-6 | 5-6 | 5-6 | 5-6 | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Mechanical Traction (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Paraffin Bath (1) | Therapeutic Procedure (2) EMS (1) Neuro Muscular Re-ed (2) Hot/Cold Packs (1) Ultrasound (1) Paraffin Bath (1) |

107.    With respect to each claimant and each visit, Defendant Morales signed a separate record memorializing such pain levels and treatments. Upon information and belief, Defendant Morales knew or acted with reckless indifference to the fact that these stated pain levels were false, given that Iriarte, Morejon, Clemente, and Gutierrez had suffered no injury, and that the treatments were unnecessary and were for the purpose of fabricating a claim. It was reasonably foreseeable to Defendant Morales that such false statements would be subsequently sent by U.S. mail or private or commercial carrier and transmitted through the interstate wires to Defendant Law Group of South Florida for further transmission by interstate wires to an insurance carrier. Such records

were in fact so mailed and transmitted. As such, each such record was prepared and executed in violation of the federal mail and wire fraud statutes (18 U.S.C. §§ 1341, 1343).

108.    As in Staged Accidents 1 and 2, Defendant Fraga and Defendant Bruzon referred Iriarte, Morejon, Clemente, and Gutierrez to Defendant Flagler Diagnostic for MRIs and medical treatment. Defendant Law Group of South Florida was again listed as a payor on resulting health insurance claim forms issued by Defendant Flagler Diagnostic for each of Iriarte, Morejon, Clemente, and Gutierrez.

109.    On February 1, 2024, Iriarte received a steroid injection administered by Defendant Burack at Defendant Flagler Diagnostic. On February 21, March 27, and May 14, 2024, Clemente also received steroid injections administered by Defendant Burack at Flagler Diagnostic. Further evidencing the coordinated nature of the conspiracy, March 27 was the very same day that Defendant Burack administered an injection to the claimant Yeni Zamora Gil ("Zamora") in connection with Staged Accident 5 as discussed below.

110.    Each such steroid injection was fraudulent and medically unnecessary given that Iriarte and Clemente had suffered no injury. For the purpose of adding the expense of such injections to their claims and to further the scheme, Defendant Burack falsely represented in connection with each injection: "The etiology of the pain is believed to be as result of the above listed trauma [*i.e.*, the staged accident]." Upon information and belief, Defendant Burack knew or acted with reckless indifference to the fact that the statements were false when made given that these claimants had suffered no such trauma. It was reasonably foreseeable to Defendant Burack that such false statements would be subsequently sent by U.S. mail or private or commercial carrier and transmitted through the interstate wires to Defendant Law Group of South Florida for further transmission by interstate wires to an insurance carrier. Such records were in fact so mailed and

transmitted. As such, each such statement was made in violation of the federal mail and wire fraud statutes (18 U.S.C. §§ 1341, 1343).

111.    On October 4, 2024, the Law Group of South Florida filed a sham complaint signed by Defendant Loynaz against Uber and others seeking recoveries for these purported injuries to Iriarte, Morejon, Clemente, and Gutierrez stemming from Staged Accident 3. The case was captioned *Iriarte Blanco v. Perez Delgado*, No. 2024-019168-CA-01 (Fla. 11th Cir. Ct.). Although the fraudulent scheme occurred outside of the litigation, the use of the interstate wires to file the lawsuit was also in furtherance of the scheme and in violation of the federal wire fraud statute (18 U.S.C. § 1343).

112.    The Law Group of South Florida continues to prosecute this case. Uber has suffered, and continues to suffer, substantial costs defending the fraudulent allegations as a result of this scheme.

**D.      Staged Accident 4**

113.    Staged Accident 4 occurred on March 25, 2024, at approximately 10:30 p.m. As with each of the other staged accidents in the scheme, Staged Accident 4 was planned in advance.

114.    Three co-conspirators occupied the lead car. Pedro Garcia Trelles ("Garcia Trelles") drove the lead car. His two passengers were Janny Oceguera Medina ("Oceguera") and Marianela Alejo Ruiz ("Alejo").

115.    Defendant Diaz drove the colliding car.

116.    The participants in this staged accident were connected with others in the scheme. For example, Defendant Diaz purchased the colliding car that he used in Staged Accident 4 from a person who lived at the same address as the driver of the lead car (Iriarte) in Staged Accident 3.

117.    The participants in the staged accident planned it in advance. Minutes before Staged Accident 4 occurred, Defendant Diaz and the driver of the lead car, Garcia Trelles, convened in

the same parking lot less than a mile from the location of Staged Accident 4 to prepare for it. GPS

data, CCTV data, and License Plate Reader data showing this are depicted below:



*Figure 7.*

118.    After Staged Accident 4 occurred, the police were called to the scene. The police

report noted no injuries and described only minor damage to the cars.

119.    Following the accident, the lead car driven by Garcia Trelles was taken to Yanes

Body Shop. As with the lead car in the other staged accidents, although Garcia Trelles's vehicle

had suffered no meaningful damage in the staged accident, additional damage was subsequently

manufactured for the purpose of supporting false claims for payment:



*Figure 8.*

120.    As with each of the other staged accidents in the scheme, Diaz utilized the driver version of the Uber application before and during the collision in order to trigger the available commercial auto liability insurance policy in furtherance of the scheme. Additionally, on April 7, 2024, Defendant Diaz transmitted photos of his vehicle to Uber again using the Uber application in furtherance of the scheme. Defendant Diaz was a knowing participant in such scheme and agreed to further its aims. Each such use of the Uber application by Defendant Diaz was a reasonably foreseeable use of interstate wires in the ordinary course of business in furtherance of the scheme and therefore constitutes a separate violation of the federal wire fraud statute (18 U.S.C. § 1343).

121.    The driver of the lead car (Garcia Trelles) and his passengers (Alejo and Oceguera) traveled to River Medical Center for fraudulent and unnecessary medical treatment. Such medical treatment was coordinated by the Law Group of South Florida.

122.    On March 26, 2024, Defendant Fraga executed an Initial Evaluation and Studies Request for Alejo, falsely diagnosing her with a "cervical spine sprain/strain," "thoracic spine sprain/strain," "lumbar spine sprain/strain," "left wrist sprain/strain," "right wrist sprain/strain," "right hip sprain/strain," and "headaches."

123.    That same day, in furtherance of the scheme, Defendant Bruzon executed an Initial Evaluation and Studies Request for Oceguera, falsely diagnosing her with a "cervical spine sprain/strain," "thoracic spine sprain/strain," "lumbar spine sprain/strain," "right shoulder sprain/strain," "right wrist sprain/strain," and "headaches."

124.    Defendants Fraga and Bruzon knew or acted with reckless indifference to the fact that such statements were false when made given that Alejo and Oceguera had suffered no such injuries. Such diagnoses were instead made for the purpose of extracting medical expenses from an insurer and to increase the amount of a claim against Uber. It was reasonably foreseeable to Defendants Fraga and Bruzon that such false statements would be subsequently sent by U.S. mail or private or commercial carrier and transmitted through the interstate wires to the Law Group of South Florida for further transmission by interstate wires to an insurance carrier. Such records were in fact so mailed and transmitted. As such, each such evaluation was executed in violation of the federal mail and wire fraud statutes (18 U.S.C. §§ 1341, 1343).

125.    To increase the amount of the claims, Defendant Fraga and Defendant Bruzon referred Alejo and Oceguera to Professional of South Florida for unnecessary therapy. Again, Alejo and Oceguera received such therapy from Defendant Morales. In coordinated fashion, Alejo and Oceguera frequently received physical therapy treatment from Defendant Morales on the same day. They did so on approximately 26 occasions over approximately 54 days.

126.    On these occasions, Alejo and Oceguera made substantially identical false statements concerning their pain levels, which started at implausibly high levels and declined nearly in lockstep. For example, Alejo and Oceguera each falsely reported pain levels of 8 on the same day in multiple sessions between March 27 and April 8; pain levels of 7-8 on April 9 and 10;

pain levels of 6-7 on April 15; pain levels of 6 at each session between April 17 and 30; and pain levels of 5-6 between May 9 and 20.

127.    During these sessions, Alejo and Oceguera received substantially the same physical therapy treatment, notwithstanding the differences in their height, weight, age, medical history, and location at the time of the staged accident. The following chart shows their treatments received on the days that they jointly attended Professional of South Florida:

| Joint Visit Dates | Reported Pain | | Treatments | |
|---|---|---|---|---|
| | Alejo | Ocegu-era | Alejo | Oceguera |
| 3/27/2024 | 8 | 8 | Therapeutic Procedure (2)<br>Self-Care/Home Management ADL (1)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1) | Therapeutic Procedure (2)<br>Self-Care/Home Management ADL (1)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1) |
| 3/28/2024 | 8 | 8 | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Paraffin Bath (1) | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Mechanical Traction (1) |
| 4/1/2024 | 8 | 8 | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Mechanical Traction (1) | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Mechanical Traction (1) |
| 4/2/2024 | 8 | 8 | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Mechanical Traction (1) | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Paraffin Bath (1) |

| Joint Visit Dates | Reported Pain | | Treatments | |
|---|---|---|---|---|
| | Alejo | Ocegu-era | Alejo | Oceguera |
| 4/3/2024 | 8 | 8 | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Mechanical Traction (1) | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Mechanical Traction (1) |
| 4/4/2024 | 8 | 8 | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Paraffin Bath (1) | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Paraffin Bath (1) |
| 4/5/2024 | 8 | 8 | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Mechanical Traction (1) | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Mechanical Traction (1) |
| 4/8/2024 | 8 | 8 | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Paraffin Bath (1) | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Mechanical Traction (1) |
| 4/9/2024 | 7-8 | 7-8 | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Paraffin Bath (1) | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Paraffin Bath (1) |
| 4/10/2024 | 7-8 | 7-8 | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Mechanical Traction (1) | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Mechanical Traction (1) |

| Joint Visit Dates | Reported Pain | | Treatments | |
|---|---|---|---|---|
| | Alejo | Ocegu-era | Alejo | Oceguera |
| 4/11/2024 | 6-7 | 7 | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Paraffin Bath (1) | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Paraffin Bath (1) |
| 4/12/2024 | 6-7 | 7 | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Paraffin Bath (1) | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Paraffin Bath (1) |
| 4/15/2024 | 6-7 | 6-7 | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Paraffin Bath (1) | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Paraffin Bath (1) |
| 4/16/2024 | 6-7 | 6 | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Mechanical Traction (1) | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Paraffin Bath (1) |
| 4/17/2024 | 6 | 6 | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Paraffin Bath (1) | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Mechanical Traction (1) |
| 4/24/2024 | 6 | 6 | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Self-Care/Home Management ADL (1) | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Mechanical Traction (1) |

| Joint Visit Dates | Reported Pain | | Treatments | |
|---|---|---|---|---|
| | Alejo | Ocegu-era | Alejo | Oceguera |
| 4/25/2024 | 6 | 6 | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Mechanical Traction (1) | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Mechanical Traction (1) |
| 4/29/2024 | 6 | 6 | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Paraffin Bath (1) | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Mechanical Traction (1) |
| 4/30/2024 | 6 | 6 | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Paraffin Bath (1) | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Mechanical Traction (1) |
| 5/1/2024 | 6 | 5-6 | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Mechanical Traction (1) | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Mechanical Traction (1) |
| 5/7/2024 | 6 | 5-6 | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Paraffin Bath (1) | Therapeutic Procedure (1)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Mechanical Traction (1) |
| 5/9/2024 | 5-6 | 5-6 | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Mechanical Traction (1) | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Mechanical Traction (1) |

| Joint Visit Dates | Reported Pain | | Treatments | |
|---|---|---|---|---|
| | Alejo | Ocegu-era | Alejo | Oceguera |
| 5/10/2024 | 5-6 | 5-6 | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Paraffin Bath (1) | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Paraffin Bath (1) |
| 5/16/2024 | 5-6 | 5-6 | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Paraffin Bath (1) | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Paraffin Bath (1) |
| 5/17/2024 | 5-6 | 5-6 | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Paraffin Bath (1) | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Mechanical Traction (1) |
| 5/20/2024 | 5-6 | 5-6 | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Mechanical Traction (1) | Therapeutic Procedure (2)<br>EMS (1)<br>Neuro Muscular Re-ed (2)<br>Hot/Cold Packs (1)<br>Ultrasound (1)<br>Mechanical Traction (1) |

128.    With respect to each claimant and each visit, Defendant Morales signed a separate record memorializing such pain levels and treatments. Upon information and belief, Defendant Morales knew or acted with reckless indifference to the fact that these stated pain levels were false, given that Alejo and Oceguera had suffered no injury, and that the treatments were unnecessary and were for the purpose of fabricating a claim. It was reasonably foreseeable to Defendant Morales that such false statements would be subsequently sent by U.S. mail or private or commercial carrier and transmitted through the interstate wires to the Law Group of South Florida for further transmission by interstate wires to an insurance carrier. Such records were in fact so

mailed and transmitted. As such, each such record was prepared and executed in violation of the federal mail and wire fraud statutes (18 U.S.C. §§ 1341, 1343).

129.    As in the other staged accidents, Defendant Fraga and Defendant Bruzon referred Alejo and Oceguera to Flagler Diagnostic for medical treatment. The Law Group of South Florida was listed as a payor on the resulting health insurance claim forms issued by Flagler Diagnostic for Alejo and Oceguera.

130.    On May 24, 2024 and June 25, 2024, respectively, Oceguera and Alejo each received lumbar MRIs read by Dr. Vincenzo Giuliano ("Giuliano"). On June 3, 2024, Oceguera also received a cervical MRI read by Dr. Modesto Sanchez Torres ("Torres"). Each MRI was medically unnecessary given that Alejo and Oceguera had suffered no injury. In fact, Oceguera had undergone a cervical MRI on January 3, 2024, before the staged accident, which yielded the same results as her cervical MRI on June 3, 2024, thus confirming that the latter's results reflected conditions that existed prior to the staged accident. Flagler Diagnostic performed these MRIs for the purpose of adding the expense of such MRIs to the co-conspirators' claims, in furtherance of the scheme.

131.    As in Staged Accidents 1 and 2, the MRI results illustrate that they were not necessary in the first place, as they disclosed no relevant injury. For instance, Giuliano reported the following for each of Alejo and Oceguera: "Osseous structures: Normal lumbar lordosis and alignment is seen without evidence of lumbar compression fracture, spondylolisthesis, or pathologic marrow defect. Conus medullaris: The conus medullaris ends normally at the thoracolumbar junction. There is no evidence of tethered cord." And Torres reported the following for Oceguera: "There are no cord masses. The appearance of the marrow is normal. The craniocervical junction is intact."

132.    On September 16, 2024, the Law Group of South Florida faxed two letters signed

by Defendant Loynaz to the insurance company for the driver of the colliding car, a single limit

policy that also insured Uber and its subsidiaries. The letters demanded payment of the full amount

of the available insurance policy limits ($1 million) to resolve each of the respective claims of

Alejo and Oceguera. The letters falsely represented as follows:

> There are no issues of causation in this case. Following the crash,
> [each claimant] was treated at … Flagler Diagnostic Center,
> Professional South Florida [sic] and River Medical Center for the
> significant injuries suffered as a direct and proximate cause of the
> violent impact from the crash. The medical records clearly show that
> the nature of their injuries is consistent with the violent impact in
> this crash. Thus, the causal connection between crash and the
> injuries claimed are evident and well documented.

133.    Upon information and belief, Defendant Loynaz and Defendant Law Group of

South Florida knew or acted with reckless indifference to the fact that such statements were false

when made. Among other things, they were aware of the staged nature of the accident, had

coordinated the unnecessary medical treatment, and had offered to stand as payor for such

treatment. Apart from the transmission of such demands, it was also reasonably foreseeable to

Defendant Loynaz and his firm that the Driver Defendant utilized interstate wires in the ordinary

course of business in connection with the staged accident as described above. Such uses of

interstate wires constituted violations of the federal wire fraud statute (18 U.S.C. § 1343). Further,

because the medical records upon which these false claims were based were solicited by and

delivered to Defendant Loynaz and Defendant Law Group of South Florida by U.S. mail or private

or commercial carrier, such conduct also constituted a violation of the federal mail fraud statute

(18 U.S.C. § 1341).

134.    On November 15, 2024, the Law Group of South Florida electronically filed a sham

complaint signed by Defendant Loynaz against Uber and others seeking recoveries for these

purported injuries to Garcia Trelles, Alejo, and Oceguera stemming from Staged Accident 4. This case was captioned *Garcia Trelles v. Diaz Valdivie*, No. 2024-022003-CA-01 (Fla. 11th Cir. Ct.). Although the fraudulent scheme occurred outside of the litigation, the use of the interstate wires to file the lawsuit was also in furtherance of the scheme and in violation of the federal wire fraud statute (18 U.S.C. § 1343).

135.    The Law Group of South Florida continues to prosecute this case. Uber has suffered, and continues to suffer, substantial costs defending the fraudulent allegations as a result of this scheme.

### E.    Staged Accident 5

136.    Staged Accident 5 occurred on January 24, 2024, at approximately 10:30 p.m. As with each of the other staged accidents in the scheme, Staged Accident 5 was planned in advance.

137.    The driver of the lead car was Defendant Valerio. Demonstrating the related nature of this scheme, Defendant Valerio was the very same person who had driven the colliding car in Staged Accident 1 and who was a defendant in the litigation arising from that incident. Valerio retained the Law Group of South Florida to bring a personal injury claim on his behalf in connection with Staged Accident 5, even though the same firm was simultaneously suing him as a defendant in connection with Staged Accident 1.

138.    In Staged Accident 5, the driver of the colliding car was Defendant Morey. Defendant Diaz was his passenger in the colliding car. Evidencing the connections among the participants in the scheme, Defendant Diaz was the driver of the colliding car in Staged Accident 4.

139.    As with other staged accidents, the lead car had multiple passengers: Zamora, Joan E. Castrillo, and Andreina C. Moros.

51

140.     After Staged Accident 5 occurred, the police were called to the scene. Morey told the police that "he was traveling eastbound on NW 75th Street when he failed to come to a complete stop striking [the lead car]," and the "Driver Distracted By" section for Morey listed "Electronic Communication Devices (cell phone, etc.)." Upon information and belief, these statements were knowingly false when made. Morey made these false statements for the purpose of triggering the available insurance policy.

141.     The police report noted no injuries and described only minor damage to both vehicles. Specifically, the report listed an "Injury Severity" of "None" and "Medical Facility Transported To" as "Refused" for each participant in the staged accident and stated that "Miami-Dade Fire Rescue was offered but denied by both drivers." The report listed "Extent of Damage" as "Functional" for the colliding car and "Minor" for the lead car and listed "Air Bag Deployed" as "Not Applicable" for both cars.

142.     Following the staged accident, the lead car was taken to King Collision. Thereafter, additional damage was manufactured for the purpose of supporting false claims of personal injury. Showing the connection between scheme participants, Defendant Morey's GPS confirms that he had been at or near King Collision shortly before the accident.

143.     As with each of the other staged accidents in the scheme, Defendant Morey utilized the driver version of the Uber application immediately before and during the collision in order to trigger the available commercial auto liability insurance policy in furtherance of the scheme. Defendant Morey was a knowing participant in such scheme and agreed to further its aims. Defendant Morey's use of the Uber application was a reasonably foreseeable use of interstate wires in the ordinary course of business in furtherance of the scheme and therefore constitutes a violation of the federal wire fraud statute (18 U.S.C. § 1343).

144.    As in other staged accidents, the Law Group of South Florida coordinated the medical treatment. The Law Group of South Florida was listed as a payor on certain resulting health insurance claim forms.

145.    Similar to other staged accidents, potential claimants were directed to Defendant Flagler Diagnostic. Specifically, Zamora visited Flagler Diagnostic on March 27, April 26, and May 30, 2024 and received steroid injections administered by Defendant Burack on March 27, 2024. The steroid injections were medically unnecessary given that Zamora had suffered no injury.

146.    For the purpose of adding the expense of such injections to her claims and to further the scheme, Defendant Burack falsely represented in connection with Zamora's March 27 and April 26 visits: "The etiology of the pain is believed to be as result of the above listed trauma [*i.e.*, the staged accident]." Upon information and belief, Defendant Burack knew or acted with reckless indifference to the fact that these statements were false when made given that this claimant had suffered no injury in the staged accident. It was reasonably foreseeable to Burack that such false statements would be subsequently sent by U.S. mail or private or commercial carrier and transmitted through the interstate wires to Defendant Law Group of South Florida for further transmission by interstate wires to an insurance carrier. Such records were in fact so mailed and transmitted. As such, each such statement was made in violation of the federal mail and wire fraud statutes (18 U.S.C. §§ 1341, 1343).

147.    On June 11, 2024, and in furtherance of the scheme, the Law Group of South Florida emailed a letter signed by Defendant Loynaz to the insurance company for the driver of the colliding car, a single limit policy that also insured Uber and its subsidiaries. The letter demanded payment of the full amount of the available insurance policy limits ($1 million) to

resolve Zamora's claims. Based on Morey's (the driver of the colliding car) phony admission of fault at the time of the staged accident, the letter falsely represented as follows:

> There are no issues of causation in this case. Following the crash, Ms. Zamora Gil was treated at Flagler Diagnostic Center, Unlimited Diagnostic Center, RN Imaging and Lian Medical and Rehab Center Corp for the significant injuries suffered as a direct and proximate cause of the violent impact from the crash. The medical records clearly show that the nature of their injuries is consistent with the violent impact in this crash. Thus, the causal connection between crash and the injuries claimed are evident and well documented.

148.    Upon information and belief, Defendant Loynaz and Defendant Law Group of South Florida knew or acted with reckless indifference to the fact that such statements were false when made. Among other things, they were aware of the staged nature of the accident, had coordinated the unnecessary medical treatment, and had offered to stand as payor for such treatment. Apart from the transmission of such demand, it was also reasonably foreseeable to Defendant Loynaz and his firm that the Driver Defendant utilized interstate wires in the ordinary course of business in connection with the staged accident as described above. Such uses of interstate wires constituted a violation of the federal wire fraud statute (18 U.S.C. § 1343). Further, because the medical records upon which this false claim was based were solicited by and delivered to Defendant Loynaz and Defendant Law Group of South Florida by U.S. mail or private or commercial carrier, such conduct also constituted a violation of the federal mail fraud statute (18 U.S.C. § 1341).

## III.    RACKETEERING ALLEGATIONS

149.    The federal and Florida RICO statutes prohibit the conduct or participation in the conduct of the management of the affairs of an enterprise through a pattern of racketeering activity. The statutes further contain expansive conspiracy provisions that extend liability to persons who know about and agree to participate in the conduct of the affairs of such an enterprise through such

a pattern of racketeering activity, even without personally committing a predicate act. Such conspiracy liability reaches any person who agrees on the overall objective of the conspiracy—here, to defraud Uber and others by generating and submitting fraudulent billing and creating a false basis for personal injury lawsuits. Such conspiracy liability also reaches any person who agrees to commit personally two predicate acts. At all relevant times, Defendants' scheme was in violation of these statutes.

### A.    Defendants' Respective Roles

150.    As described above, the Medical Provider Defendants have been, continue to be, and likely will in the future be involved in the treatment of personal injury claimants for the purpose of fabricating and profiting from falsified claims arising from the staged accidents.

151.    As part of and in furtherance of the scheme, each Medical Provider Defendant controlled and directed the provision of unnecessary medical treatment to the claimants. The Medical Provider Defendants made false diagnoses and illegitimate referrals, performed unnecessary treatment and procedures, and supplied false documentation and statements with the aim and understanding that such documentation and treatment would supply a basis for claims for payment in furtherance of the scheme.

152.    River Medical Center has been involved in recently filed criminal cases. According to criminal complaints filed on March 20, 2025 and May 14, 2025 in the Eleventh Judicial Circuit of Florida, four defendants charged with engaging in a criminal staged accident scheme sought treatment at River Medical Center following staged accidents that occurred on August 20, 2024 and January 22, 2025.

153.    Another Medical Provider Defendant, Burack, recently completed a 15-month sentence for conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349, following a guilty plea. *See United States v. Burack*, No. 9:23-cr-80109-AHS-3 (S.D. Fla.), ECF No. 31. In

connection with the plea, Burack acknowledged that he had conspired to create medically unnecessary orders for genetic tests that a laboratory billed to Medicare. Defendant Burack admitted that he knew that the genetic tests were not medically necessary and knew that he did not order them to treat the Medicare beneficiaries for any specific medical problem, symptom, illness, or diagnosis. *Id.*, ECF No. 32. Defendant Burack signed prescriptions despite never seeing the Medicare beneficiaries. *Id.* On April 14, 2025, at or around the time that Defendant Burack was released from federal prison, the State of Florida Department of Health filed an administrative complaint against Burack before the state Board of Osteopathic Medicine in connection with Burack's criminal disposition. The Department alleges that Burack has violated Fla. Stat. § 456.072(1)(c) by virtue of his guilty plea, and the Department is requesting an order that, among other penalties, imposes a permanent revocation or suspension of Burack's license.

154.    Burack's employer during the relevant period, Defendant Flagler Diagnostic, has been named as a defendant in a RICO lawsuit filed by the Allstate insurance company alleging its participation in a fraudulent scheme of providing fabricated or unnecessary medical treatment for injuries stemming from staged vehicle accidents in order to bill for, and collect on, bogus insurance claims. The complaint filed in *Allstate Insurance Co. v. Red Diamond Medical Group, LLC*, No. 1:23-cv-23661-KMM (S.D. Fla.), alleges that Flagler Diagnostic and the other defendants engaged in a predetermined course of sham treatment for claimants involving services that were not actually provided or were not medically necessary in order to fraudulently bill Allstate for said services. Flagler Diagnostic's role was to perform medically unnecessary diagnostic imaging, including several MRIs per patient. Based on the complaint's allegations, this Court denied Flagler Diagnostic's and the other defendants' motion to dismiss. One day later, the parties notified the Court that they had reached a settlement.

155.     As described above, the Law Firm Defendants participated in and advanced this scheme by funneling claimants to and/or making other payments to the Medical Provider Defendants for the purpose of fabricating claims and sham lawsuits. The Law Firm Defendants backstopped the provision of such treatment, including by acting as listed payors for claimants who otherwise lacked insurance. The Law Firm Defendants agreed to monetize the unnecessary treatment by pursuing claims against Uber, insurance companies, and others through the racketeering activity described herein. By doing so, the Law Firm Defendants directly or indirectly conferred a benefit on the Medical Provider Defendants with the intent that such compensation would influence the Medical Provider Defendants to violate their applicable duties, including by the production of attendant false statements regarding injuries and treatments, in violation of Florida's commercial bribery statute.

156.     The Law Firm Defendants have participated in and advanced this scheme not only in the above cases but in similar claims resulting from staged accidents that occurred at or about the same time. Litigation arising from such staged accidents remains ongoing as the Law Firm Defendants continue to pursue the sham lawsuits.

157.     The Driver Defendants (Valerio, Loaces, Perez, Diaz, and Morey) utilized the Uber application to carry out the scheme. They utilized the application prior to and in connection with the staged accidents for purposes of manufacturing claims against Uber. They typically utilized the application following the staged accidents in order to report the incident to Uber in furtherance of the scheme. Each of the Driver Defendants was aware of the scheme, agreed to act in furtherance of it, and did act in furtherance of such scheme through the racketeering activity described above.

**B.     The RICO Enterprise**

158.     The Law Firm Defendants and Medical Provider Defendants have each conducted or participated in the conduct of the management of the affairs of an enterprise.

159.    As an initial matter, each of River Medical Center, Professional of South Florida, and Flagler Diagnostic are legal entities constituting an enterprise. These medical practices are also collectively an enterprise in that they are associated together in fact for the common purpose of enriching themselves through the fraudulent course of conduct directed at Uber and others described above, including their fraudulent provision of health services to patients, outside the regular course of their businesses. They actively work together and function as a unit to achieve that purpose and share a common intent to further that goal.

160.    River Medical Center, Professional of South Florida, and Flagler Diagnostic are affiliated with each other, share long-standing relationships with each other, act for each other's common benefit, and depend on one another and their respective activities for such benefit:

a.      These entities collaborated by referring patients to each other and treating patients referred to them by each other, including but not limited to the cases described above;

b.      River Medical Center and Flagler Diagnostic are located on the same floor in the same building; and

c.      River Medical Center and Professional of South Florida utilize the same electronic system for managing patients' accounts.

161.    Each of the entities share geographical proximity in that their respective medical practices are concentrated in Miami-Dade County and the surrounding area. They came to collaborate as a result of their long involvement in treating personal injury plaintiffs in that jurisdiction.

162.    The Medical Provider Defendants conducted or participated in the conduct of the operation or management of the enterprise through their respective roles in delivering health

services to patients. The Law Firm Defendants similarly did so through the funneling of claimants to and/or the making of other payments to the Medical Provider Defendants and the coordination of the purported treatment as described herein. The Law Firm Defendants further conspired with the Medical Provider Defendants, knowingly advancing the Medical Provider Defendants' actionable conduct including by taking steps to monetize the fraudulent medical treatment.

163.    The enterprise itself is distinct from the pattern of racketeering activity arising from the staged accident scheme given that the medical practices also delivered legitimate health services. Notwithstanding their connections and coordination, each of River Medical Center, Professional of South Florida, and Flagler Diagnostic: are separate and distinct corporations from each other; provide different health services from each other; are free to act independently and advance their own separate interests; and are not merely agents all acting for the same person or entity.

164.    The enterprise was of sufficient longevity to accomplish its purposes, originating at least as early as 2023 and threatening to continue into the future.

165.    In the alternative, the Law Group of South Florida also constitutes an enterprise. Defendant Loynaz operated, managed, and controlled the law firm directly in furtherance of the scheme. The Medical Provider Defendants conspired with Loynaz by knowingly agreeing to participate in the conduct of the affairs of the enterprise through their fraudulent medical treatment, which Defendant Loynaz used for the submission of false claims and sham lawsuits.

166.    In the alternative, River Medical Center also constitutes an enterprise. Defendants Bruzon, Fraga, and Garcia operated, managed, and controlled the medical practice directly in furtherance of the scheme. Defendants Professional of South Florida, Flagler Diagnostic, Morales, Burack, Law Group of South Florida, and Loynaz conspired with Defendants Bruzon, Fraga, and

Garcia by knowingly agreeing to participate in the conduct of the affairs of the enterprise. Defendants Professional of South Florida, Flagler Diagnostic, Morales, and Burack did so by their additional and complementary provision of fraudulent medical treatment. Defendants Law Group of South Florida and Loynaz did so by their submission of false claims and sham lawsuits based on the fraudulent medical treatment and through the payments described above.

167.    In the alternative, Professional of South Florida also constitutes an enterprise. Defendant Morales operated, managed, and controlled the medical practice directly in furtherance of the scheme. Defendants River Medical Center, Flagler Diagnostic, Bruzon, Fraga, Garcia, Burack, Law Group of South Florida, and Loynaz conspired with Defendant Morales by knowingly agreeing to participate in the conduct of the affairs of the enterprise. Defendants River Medical Center, Flagler Diagnostic, Bruzon, Fraga, Garcia, and Burack did so by their additional and complementary provision of fraudulent medical treatment. Defendants Law Group of South Florida and Loynaz did so by their submission of false claims and sham lawsuits based on the fraudulent medical treatment and through the payments described above.

168.    In the alternative, Flagler Diagnostic also constitutes an enterprise. Defendant Burack operated, managed, and controlled the medical practice directly in furtherance of the scheme. Defendants River Medical Center, Professional of South Florida, Bruzon, Fraga, Garcia, Morales, Law Group of South Florida, and Loynaz conspired with Defendant Burack by knowingly agreeing to participate in the conduct of the affairs of the enterprise. Defendants River Medical Center, Professional of South Florida, Bruzon, Fraga, Garcia, and Morales did so by their additional and complementary provision of fraudulent medical treatment. Defendants Law Group of South Florida and Loynaz did so by their submission of false claims and sham lawsuits based on the fraudulent medical treatment and through the payments described above.

169.    At all relevant times, each such enterprise was engaged in, and their activities affected, interstate commerce given that their activities were directed at and intended to influence out-of-state entities, including Uber.

### C.    Pattern of Racketeering Activity

170.    Defendants' scheme constitutes a pattern of racketeering activity. The pattern of racketeering activity includes, among others, the commission of the predicate acts and the violations of the specific statutes described above and below.

171.    Defendants committed these acts willfully and knowingly.

172.    The predicate acts relate to each other as a part of a common plan. The Defendants' roles in the scheme all depended on each other. The Driver Defendants participated in the staged accidents in exchange for actual or prospective payments and/or kickbacks. The Law Firm Defendants coordinated the predetermined course of unnecessary medical treatment that followed. The Medical Provider Defendants performed the unnecessary services and generated false documentation in order to monetize their treatments. The Law Firm Defendants then used this false evidence to fraudulently attempt to induce payments of claims and larger settlements. Each Defendant was aware of their respective role within the larger scheme.

173.    The predicate acts further relate to the enterprises described above. The Medical Provider Defendants made, directly or indirectly, corrupt payments to the participants in the staged accidents in exchange for undergoing unnecessary medical treatments. The Law Firm Defendants coordinated the courses of purported treatments in exchange for the provision of fraudulent services and false documentation from the Medical Provider Defendants. The Law Firm Defendants then used these unnecessary treatments and false records to initiate and perpetuate sham litigation against Uber and fraudulently attempt to induce larger settlements. The Driver

Defendants staged the underlying accidents to create a false appearance of injury and utilized the Uber application in order to manufacture claims against Uber.

174.    A specific threat of repetition exists with respect to such acts. Such predicate acts are a regular way of conducting the ongoing legal practice and medical practices at issue herein. Such acts are also attributable to all Law Firm Defendants and Medical Provider Defendants operating as part of a long-term association-in-fact. Hence, the pattern of activity is part of an open-ended and ongoing scheme.

175.    The acts also occurred over a substantial period of time and hence constitute a pattern of activity even if the scheme were not ongoing.

**D.    Uber Is a Victim of the Scheme and Has Suffered Injury**

176.    Uber is a victim of Defendants' scheme because it has incurred substantial expense in defending these false or inflated claims. The unnecessary medical treatments provided through Defendants' scheme of fraud, commercial bribery, and patient brokering, and the false statements buttressing the necessity of those treatments, allowed the Law Firm Defendants to bring personal injury lawsuits against Uber to fraudulently induce significantly larger settlement payments in such lawsuits. As such, Uber has been forced to incur legal costs in defending these lawsuits in excess of what would have otherwise been required. And since the staged accidents that caused the purported injuries were entirely staged, zero costs would otherwise have been required. These inflated costs damaged Uber in its business or property. This damage was the direct result of Defendants' pattern of racketeering activity.

177.    Although Uber's investigation into the full extent of the scheme remains ongoing, Uber has uncovered several million dollars in defense costs and settlements directly resulting from this scheme.

178.    Uber is not the only victim of this scheme. The courts of the State of Florida and Uber's co-defendants are also its victims. Notwithstanding their own profits from the scheme, even the claimants themselves have suffered from unnecessary medical treatment resulting from Defendants' greed.

## CAUSES OF ACTION

### COUNT I
**Federal RICO Violation (18 U.S.C. § 1962(c))**
**Association-in-Fact Enterprise**
**(Against the Law Firm Defendants and the Medical Provider Defendants)**

179.    Uber incorporates herein by reference each and every allegation in paragraphs 1 through 178 above.

180.    At all relevant times herein, River Medical Center, Professional of South Florida, and Flagler Diagnostic constituted an "enterprise" as that term is defined in 18 U.S.C. § 1961(4). River Medical Center, Professional of South Florida, and Flagler Diagnostic constituted a group of legal entities associated in fact, which were engaged in, and the activities of which affected, interstate commerce. Each of the Law Firm Defendants and Medical Provider Defendants participated in the operation or management of the enterprise.

181.    The enterprise's racketeering activities, as described throughout this Complaint, included:

   a.    Violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon voluntarily and intentionally devising and/or participating with knowledge of or reckless indifference to its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations;

   b.    Violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon voluntarily and intentionally devising and/or participating with knowledge of or reckless

indifference to its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations;

c. Violations of the Florida commercial bribery statute, Fla. Stat. § 838.16, based upon agreeing to confer benefits on physicians while knowing that the physicians were subject to various statutory and common-law duties as physicians and with the intent that such benefits would influence the physicians to violate those duties; and

d. Violations of the Florida patient brokering act, Fla. Stat. § 817.505, based upon the offer, payment, solicitation or receipt, directly or indirectly, of benefits, kickbacks and bribes, directly or indirectly, in cash or in kind, for inducing the referral of a patient or patronage to or from a health care provider or health care facility, referring a patient or patronage to or from a health care provider or health care facility, accepting or acknowledging treatment from a health care provider or health care facility, or aiding, abetting, advising, or otherwise participating in such conduct.

182. Each of the Law Firm Defendants and Medical Provider Defendants knowingly and willfully associated with the association-in-fact and conducted and participated in the conduct of the enterprise's affairs through a pattern of racketeering activity.

183. Uber has been injured in its business and property by reason of the above-described conduct.

184. By reason of its injury, Uber is entitled to equitable relief under 18 U.S.C. § 1964(a). It is also entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT II
### Federal RICO Violation (18 U.S.C. § 1962(c))
### Law Group of South Florida Enterprise
### (Against Loynaz)

185.     Uber incorporates herein by reference each and every allegation in paragraphs 1 through 178 above.

186.     The Law Group of South Florida is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

187.     Defendant Loynaz knowingly conducted and/or participated, directly or indirectly, in the conduct of Defendant Law Group of South Florida's affairs through a pattern of racketeering activity, as defined in 18 U.S.C. § 1961(1)(A).

188.     Defendant's racketeering activities, as described in detail in this Complaint, included:

a.     Violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon voluntarily and intentionally devising and/or participating with knowledge of or reckless indifference to its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations;

b.     Violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon voluntarily and intentionally devising and/or participating with knowledge of or reckless indifference to its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations;

c.     Violations of the Florida commercial bribery statute, Fla. Stat. § 838.16, based upon agreeing to confer benefits on physicians while knowing that the physicians were subject to various statutory and common-law duties as physicians and with

65

the intent that such benefits would influence the physicians to violate those duties; and

d.     Violations of the Florida patient brokering act, Fla. Stat. § 817.505, based upon the offer, payment, solicitation or receipt, directly or indirectly, of benefits, kickbacks and bribes, directly or indirectly, in cash or in kind, for inducing the referral of a patient or patronage to or from a health care provider or health care facility, refer-ring a patient or patronage to or from a health care provider or health care facility, accepting or acknowledging treatment from a health care provider or health care facility, or aiding, abetting, advising, or otherwise participating in such conduct.

189.    Defendant knowingly and willfully associated with the enterprise and conducted and participated in the conduct of the enterprise's affairs, through a pattern of racketeering activity.

190.    Uber has been injured in its business and property by reason of the above-described conduct.

191.    By reason of its injury, Uber is entitled to equitable relief under 18 U.S.C. § 1964(a). It is also entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**COUNT III**
**Federal RICO Violation (18 U.S.C. § 1962(c))**
**River Medical Center Enterprise**
**(Against the Law Firm Defendants, Bruzon, Fraga, and Garcia)**

192.    Uber incorporates herein by reference each and every allegation in paragraphs 1 through 178 above.

193.    River Medical Center is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

194.     Defendants Loynaz, Law Group of South Florida, Bruzon, Fraga, and Garcia knowingly conducted and/or participated, directly or indirectly, in the conduct of Defendant River Medical Center's affairs through a pattern of racketeering activity, as defined in 18 U.S.C. § 1961(1)(A).

195.     Defendants' racketeering activities, as described in detail in this Complaint, included:

a.      Violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon voluntarily and intentionally devising and/or participating with knowledge of or reckless indifference to its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations;

b.      Violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon voluntarily and intentionally devising and/or participating with knowledge of or reckless indifference to its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations;

c.      Violations of the Florida commercial bribery statute, Fla. Stat. § 838.16, based upon agreeing to confer benefits on physicians while knowing that the physicians were subject to various statutory and common-law duties as physicians and with the intent that such benefits would influence the physicians to violate those duties; and

d.      Violations of the Florida patient brokering act, Fla. Stat. § 817.505, based upon the offer, payment, solicitation or receipt, directly or indirectly, of benefits, kickbacks and bribes, directly or indirectly, in cash or in kind, for inducing the referral of a patient or patronage to or from a health care provider or health care facility,

referring a patient or patronage to or from a health care provider or health care
facility, accepting or acknowledging treatment from a health care provider or health
care facility, or aiding, abetting, advising, or otherwise participating in such con-
duct.

196.     Defendants knowingly and willfully associated with the enterprise and conducted
and participated in the conduct of the enterprise's affairs, through a pattern of racketeering activity.

197.     Uber has been injured in its business and property by reason of the above-described
conduct.

198.     By reason of its injury, Uber is entitled to equitable relief under 18 U.S.C.
§ 1964(a). It is also entitled to treble damages, costs, and reasonable attorneys' fees pursuant to
18 U.S.C. § 1964(c).

**COUNT IV**
**Federal RICO Violation (18 U.S.C. § 1962(c))**
**Professional of South Florida Enterprise**
**(Against the Law Firm Defendants and Morales)**

199.     Uber incorporates herein by reference each and every allegation in paragraphs
1 through 178 above.

200.     Professional of South Florida is an ongoing "enterprise," as that term is defined in
18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

201.     Defendants Loynaz, Law Group of South Florida, and Morales knowingly
conducted and/or participated, directly or indirectly, in the conduct of Defendant Professional of
South Florida's affairs through a pattern of racketeering activity, as defined in 18 U.S.C.
§ 1961(1)(A).

202.     Defendant's racketeering activities, as described in detail in this Complaint,
included:

a.   Violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon voluntarily and intentionally devising and/or participating with knowledge of or reckless indifference to its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations;

b.   Violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon voluntarily and intentionally devising and/or participating with knowledge of or reckless indifference to its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations;

c.   Violations of the Florida commercial bribery statute, Fla. Stat. § 838.16, based upon agreeing to confer benefits on physicians while knowing that the physicians were subject to various statutory and common-law duties as physicians and with the intent that such benefits would influence the physicians to violate those duties; and

d.   Violations of the Florida patient brokering act, Fla. Stat. § 817.505, based upon the offer, payment, solicitation or receipt, directly or indirectly, of benefits, kickbacks and bribes, directly or indirectly, in cash or in kind, for inducing the referral of a patient or patronage to or from a health care provider or health care facility, referring a patient or patronage to or from a health care provider or health care facility, accepting or acknowledging treatment from a health care provider or health care facility, or aiding, abetting, advising, or otherwise participating in such conduct.

203.   Defendant knowingly and willfully associated with the enterprise and conducted and participated in the conduct of the enterprise's affairs, through a pattern of racketeering activity.

204.    Uber has been injured in its business and property by reason of the above-described conduct.

205.    By reason of its injury, Uber is entitled to equitable relief under 18 U.S.C. § 1964(a). It is also entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**COUNT V**
**Federal RICO Violation (18 U.S.C. § 1962(c))**
**Flagler Diagnostic Enterprise**
**(Against the Law Firm Defendants and Burack)**

206.    Uber incorporates herein by reference each and every allegation in paragraphs 1 through 178 above.

207.    Flagler Diagnostic is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

208.    Defendants Loynaz, Law Group of South Florida, and Burack knowingly conducted and/or participated, directly or indirectly, in the conduct of Defendant Flagler Diagnostic's affairs through a pattern of racketeering activity, as defined in 18 U.S.C. § 1961(1)(A).

209.    Defendant's racketeering activities, as described in detail in this Complaint, included:

a.    Violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon voluntarily and intentionally devising and/or participating with knowledge of or reckless indifference to its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations;

b.    Violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon voluntarily and intentionally devising and/or participating with knowledge of or reckless

indifference to its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations;

c.    Violations of the Florida commercial bribery statute, Fla. Stat. § 838.16, based upon agreeing to confer benefits on physicians while knowing that the physicians were subject to various statutory and common-law duties as physicians and with the intent that such benefits would influence the physicians to violate those duties; and

d.    Violations of the Florida patient brokering act, Fla. Stat. § 817.505, based upon the offer, payment, solicitation or receipt, directly or indirectly, of benefits, kickbacks and bribes, directly or indirectly, in cash or in kind, for inducing the referral of a patient or patronage to or from a health care provider or health care facility, refer-ring a patient or patronage to or from a health care provider or health care facility, accepting or acknowledging treatment from a health care provider or health care facility, or aiding, abetting, advising, or otherwise participating in such conduct.

210.    Defendant knowingly and willfully associated with the enterprise and conducted and participated in the conduct of the enterprise's affairs, through a pattern of racketeering activity.

211.    Uber has been injured in its business and property by reason of the above-described conduct.

212.    By reason of its injury, Uber is entitled to equitable relief under 18 U.S.C. § 1964(a). It is also entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT VI
## Federal RICO Conspiracy (18 U.S.C. § 1962(d))
### (Against All Defendants)

213.    Uber incorporates herein by reference each and every allegation in paragraphs 1 through 178 above.

214.    For at least the time period referenced herein, Defendants did unlawfully, knowingly, and intentionally combine, conspire, and agree together with each other, and with others whose names are known or unknown, to conduct and participate, directly and/or indirectly, in the conduct of the affairs of each enterprise identified above through a pattern of racketeering activity set forth herein in violation of 18 U.S.C. § 1962(d).

215.    This pattern of racketeering activity in which the Defendants intentionally conspired to engage involved the specific acts as described in detail in this Complaint constituting wire fraud in violation of 18 U.S.C. § 1343, mail fraud in violation of 18 U.S.C. § 1341, commercial bribery in violation of Fla. Stat. § 838.16, and patient brokering in violation of Fla. Stat. § 817.505.

216.    All of these predicate acts constituted "racketeering activity" as defined in 18 U.S.C. § 1961(1)(A).

217.    The overall objective of the conspiracy was to defraud Uber and others by generating and submitting fraudulent billing and creating a false basis for personal injury lawsuits.

218.    Each Defendant either agreed on the overall objective of the conspiracy or agreed to commit personally two of these predicate acts.

219.    Uber has been injured in its business and property by reason of the above-described conduct.

220.     By reason of its injury, Uber is entitled to equitable relief under 18 U.S.C. § 1964(a). It is also entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**COUNT VII**
**Florida RICO Violation (Fla. Stat. § 772.103(3))**
**Association-in-Fact Enterprise**
**(Against the Law Firm Defendants and the Medical Provider Defendants)**

221.     Uber incorporates herein by reference each and every allegation in paragraphs 1 through 178 above.

222.     At all relevant times herein, River Medical Center, Professional of South Florida, and Flagler Diagnostic constituted an "enterprise" as that term is defined in Fla. Stat. § 772.102(3). River Medical Center, Professional of South Florida, and Flagler Diagnostic constituted a group of legal entities associated in fact, which was engaged in, and the activities of which affected, interstate commerce. Each of the Law Firm Defendants and Medical Provider Defendants participated in the operation or management of the enterprise.

223.     The enterprise's criminal activities, as described throughout this Complaint, included:

a.      Violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon voluntarily and intentionally devising and/or participating with knowledge of or reckless indifference to its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations;

b.      Violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon voluntarily and intentionally devising and/or participating with knowledge of or reckless indifference to its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations;

73

c.      Violations of the Florida commercial bribery statute, Fla. Stat. § 838.16, based upon agreeing to confer benefits on physicians while knowing that the physicians were subject to various statutory and common-law duties as physicians and with the intent that such benefits would influence the physicians to violate those duties;

d.      Violations of the Florida Communications Fraud Act, Fla. Stat. § 817.034(4)(a), based upon engaging in a scheme to defraud Uber and others and obtaining property thereby;

e.      Violations of the Florida Communications Fraud Act, Fla. Stat. § 817.034(4)(b), based upon engaging in a scheme to defraud Uber and others and, in furtherance of that scheme, communicating with Uber and others with intent to obtain property from them;

f.      Violations of the Florida insurance fraud statute, Fla. Stat. § 817.234(1)(a), based upon presenting or causing to be presented written or oral statements as part of, or in support of, claims for payments or other benefits pursuant to an insurance policy, knowing that such statements contained false, incomplete, or misleading information concerning facts or things material to such claims;

g.      Violations of the Florida insurance fraud statute, Fla. Stat. § 817.234(2)(a), based upon licensed medical practitioners knowingly and willfully assisting, conspiring with, or urging insured parties to fraudulently violate provisions of Section 817 or provisions of Chapter XI of Section 627, and based upon other persons, due to the assistance, conspiracy, or urging by said practitioners, knowingly and willfully benefitting from the proceeds derived from the use of such fraud;

h.    Violations of the Florida insurance fraud statute, Fla. Stat. § 817.234(8)(a), based upon soliciting or causing to be solicited business from persons involved in motor vehicle accidents for the purpose of making, adjusting, or settling motor vehicle tort claims or claims for personal injury protection benefits while intending to defraud Uber and others; and

i.    Violations of the Florida insurance fraud statute, Fla. Stat. § 817.234(9), based upon organizing, planning, or knowingly participating in intentional motor vehicle crashes or schemes to create documentation of motor vehicle crashes that did not occur for the purpose of making motor vehicle tort claims or claims for personal injury protection benefits.

224.    Each of the Law Firm Defendants and Medical Provider Defendants knowingly and willfully associated with the association-in-fact and conducted or participated in the conduct of the enterprise's affairs through a pattern of criminal activity.

225.    Uber has been injured in its business and property by reason of the above-described conduct.

226.    By reason of its injury, Uber is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to Fla. Stat. § 772.104.

**COUNT VIII**
**Florida RICO Violation (Fla. Stat. § 772.103(3))**
**Law Group of South Florida Enterprise**
**(Against Loynaz)**

227.    Uber incorporates herein by reference each and every allegation in paragraphs 1 through 178 above.

228.    The Law Group of South Florida is an ongoing "enterprise," as that term is defined in Fla. Stat. § 772.102(3), that engages in activities which affect interstate commerce.

229.     Defendant Loynaz knowingly conducted and/or participated, directly or indirectly, in the conduct of the Defendant Law Group of South Florida's affairs through a pattern of criminal activities, as defined in Fla. Stat. § 772.102(1).

230.     Defendant's criminal activities, as described in detail in this Complaint, included:

231.     Violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon voluntarily and intentionally devising and/or participating with knowledge of or reckless indifference to its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations;

232.     Violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon voluntarily and intentionally devising and/or participating with knowledge of or reckless indifference to its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations;

233.     Violations of the Florida commercial bribery statute, Fla. Stat. § 838.16, based upon agreeing to confer benefits on physicians while knowing that the physicians were subject to various statutory and common-law duties as physicians and with the intent that such benefits would influence the physicians to violate those duties;

234.     Violations of the Florida Communications Fraud Act, Fla. Stat. § 817.034(4)(a), based upon engaging in a scheme to defraud Uber and others and obtaining property thereby;

235.     Violations of the Florida Communications Fraud Act, Fla. Stat. § 817.034(4)(b), based upon engaging in a scheme to defraud Uber and others and, in furtherance of that scheme, communicating with Uber and others with intent to obtain property from them;

236.     Violations of the Florida insurance fraud statute, Fla. Stat. § 817.234(1)(a), based upon presenting or causing to be presented written or oral statements as part of, or in support of,

claims for payments or other benefits pursuant to an insurance policy, knowing that such statements contained false, incomplete, or misleading information concerning facts or things material to such claims;

237.    Violations of the Florida insurance fraud statute, Fla. Stat. § 817.234(2)(a), based upon, due to the knowing and willful assistance, conspiracy, or urging by licensed medical practitioners for insured parties to fraudulently violate multiple provisions of Section 817 or provisions of Part XI of Chapter 627, knowingly and willfully benefitting from the proceeds derived from the use of such fraud;

238.    Violations of the Florida insurance fraud statute, Fla. Stat. § 817.234(8)(a), based upon soliciting or causing to be solicited business from persons involved in motor vehicle accidents for the purpose of making, adjusting, or settling motor vehicle tort claims or claims for personal injury protection benefits while intending to defraud Uber and others; and

239.    Violations of the Florida insurance fraud statute, Fla. Stat. § 817.234(9), based upon organizing, planning, or knowingly participating in intentional motor vehicle crashes or schemes to create documentation of motor vehicle crashes that did not occur for the purpose of making motor vehicle tort claims or claims for personal injury protection benefits.

240.    Defendant knowingly and willfully associated with the enterprise and conducted and/or participated in the conduct of the enterprise's affairs, through a pattern of criminal activity.

241.    Uber has been injured in its business and property by reason of the above-described conduct.

242.    By reason of its injury, Uber is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to Fla. Stat. § 772.104.

**COUNT IX**
**Florida RICO Violation (Fla. Stat. § 772.103(3))**
**River Medical Center Enterprise**
**(Against the Law Firm Defendants, Bruzon, Fraga, and Garcia)**

243.     Uber incorporates herein by reference each and every allegation in paragraphs 1 through 178 above.

244.     River Medical Center is an ongoing "enterprise," as that term is defined in Fla. Stat. § 772.102(3), that engages in activities which affect interstate commerce.

245.     Defendants Loynaz, Law Group of South Florida, Bruzon, Fraga, and Garcia knowingly conducted and/or participated, directly or indirectly, in the conduct of the Defendant River Medical Center's affairs through a pattern of criminal activities, as defined in Fla. Stat. § 772.102(1).

246.     Defendants' criminal activities, as described in detail in this Complaint, included:

247.     Violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon voluntarily and intentionally devising and/or participating with knowledge of or reckless indifference to its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations;

248.     Violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon voluntarily and intentionally devising and/or participating with knowledge of or reckless indifference to its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations;

249.     Violations of the Florida commercial bribery statute, Fla. Stat. § 838.16, based upon agreeing to confer benefits on physicians while knowing that the physicians were subject to various statutory and common-law duties as physicians and with the intent that such benefits would influence the physicians to violate those duties;

250.    Violations of the Florida Communications Fraud Act, Fla. Stat. § 817.034(4)(a), based upon engaging in a scheme to defraud Uber and others and obtaining property thereby;

251.    Violations of the Florida Communications Fraud Act, Fla. Stat. § 817.034(4)(b), based upon engaging in a scheme to defraud Uber and others and, in furtherance of that scheme, communicating with Uber and others with intent to obtain property from them;

252.    Violations of the Florida insurance fraud statute, Fla. Stat. § 817.234(1)(a), based upon presenting or causing to be presented written or oral statements as part of, or in support of, claims for payments or other benefits pursuant to an insurance policy, knowing that such statements contained false, incomplete, or misleading information concerning facts or things material to such claims;

253.    Violations of the Florida insurance fraud statute, Fla. Stat. § 817.234(2)(a), based upon the knowing and willful assistance, conspiracy, or urging by licensed medical practitioners for insured parties to fraudulently violate provisions of Section 817 or provisions of Part XI of Chapter 627;

254.    Violations of the Florida insurance fraud statute, Fla. Stat. § 817.234(8)(a), based upon soliciting or causing to be solicited business from persons involved in motor vehicle accidents for the purpose of making, adjusting, or settling motor vehicle tort claims or claims for personal injury protection benefits while intending to defraud Uber and others; and

255.    Violations of the Florida insurance fraud statute, Fla. Stat. § 817.234(9), based upon organizing, planning, or knowingly participating in intentional motor vehicle crashes or schemes to create documentation of motor vehicle crashes that did not occur for the purpose of making motor vehicle tort claims or claims for personal injury protection benefits.

256.    Defendants knowingly and willfully associated with the enterprise and conducted and/or participated in the conduct of the enterprise's affairs, through a pattern of criminal activity.

257.    Uber has been injured in its business and property by reason of the above-described conduct.

258.    By reason of its injury, Uber is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to Fla. Stat. § 772.104.

**COUNT X**
**Florida RICO Violation (Fla. Stat. § 772.103(3))**
**Professional of South Florida Enterprise**
**(Against the Law Firm Defendants and Morales)**

259.    Uber incorporates herein by reference each and every allegation in paragraphs 1 through 178 above.

260.    Professional of South Florida is an ongoing "enterprise," as that term is defined in Fla. Stat. § 772.102(3), that engages in activities which affect interstate commerce.

261.    Defendants Loynaz, Law Group of South Florida, and Morales knowingly conducted and/or participated, directly or indirectly, in the conduct of the Defendant Professional of South Florida's affairs through a pattern of criminal activities, as defined in Fla. Stat. § 772.102(1).

262.    Defendant's criminal activities, as described in detail in this Complaint, included:

263.    Violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon voluntarily and intentionally devising and/or participating with knowledge of or reckless indifference to its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations;

264.    Violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon voluntarily and intentionally devising and/or participating with knowledge of or reckless

indifference to its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations;

265.    Violations of the Florida commercial bribery statute, Fla. Stat. § 838.16, based upon agreeing to confer benefits on physicians while knowing that the physicians were subject to various statutory and common-law duties as physicians and with the intent that such benefits would influence the physicians to violate those duties;

266.    Violations of the Florida Communications Fraud Act, Fla. Stat. § 817.034(4)(a), based upon engaging in a scheme to defraud Uber and others and obtaining property thereby;

267.    Violations of the Florida Communications Fraud Act, Fla. Stat. § 817.034(4)(b), based upon engaging in a scheme to defraud Uber and others and, in furtherance of that scheme, communicating with Uber and others with intent to obtain property from them;

268.    Violations of the Florida insurance fraud statute, Fla. Stat. § 817.234(1)(a), based upon presenting or causing to be presented written or oral statements as part of, or in support of, claims for payments or other benefits pursuant to an insurance policy, knowing that such statements contained false, incomplete, or misleading information concerning facts or things material to such claims;

269.    Violations of the Florida insurance fraud statute, Fla. Stat. § 817.234(2)(a), based upon the knowing and willful assistance, conspiracy, or urging by licensed medical practitioners for insured parties to fraudulently violate provisions of Section 817 or provisions of Part XI of Chapter 627;

270.    Violations of the Florida insurance fraud statute, Fla. Stat. § 817.234(8)(a), based upon soliciting or causing to be solicited business from persons involved in motor vehicle

81

accidents for the purpose of making, adjusting, or settling motor vehicle tort claims or claims for personal injury protection benefits while intending to defraud Uber and others; and

271.   Violations of the Florida insurance fraud statute, Fla. Stat. § 817.234(9), based upon organizing, planning, or knowingly participating in intentional motor vehicle crashes or schemes to create documentation of motor vehicle crashes that did not occur for the purpose of making motor vehicle tort claims or claims for personal injury protection benefits.

272.   Defendant knowingly and willfully associated with the enterprise and conducted or participated in the conduct of the enterprise's affairs, through a pattern of criminal activity.

273.   Uber has been injured in its business and property by reason of the above-described conduct.

274.   By reason of its injury, Uber is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to Fla. Stat. § 772.104.

## COUNT XI
### Florida RICO Violation (Fla. Stat. § 772.103(3))
### Flagler Diagnostic Enterprise
### (Against the Law Firm Defendants and Burack)

275.   Uber incorporates herein by reference each and every allegation in paragraphs 1 through 178 above.

276.   Flagler Diagnostic is an ongoing "enterprise," as that term is defined in Fla. Stat. § 772.102(3), that engages in activities which affect interstate commerce.

277.   Defendants Loynaz, Law Group of South Florida, and Burack knowingly conducted and/or participated, directly or indirectly, in the conduct of the Defendant Flagler Diagnostic's affairs through a pattern of criminal activities, as defined in Fla. Stat. § 772.102(1).

278.   Defendant's criminal activities, as described in detail in this Complaint, included:

279.    Violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon voluntarily and intentionally devising and/or participating with knowledge of or reckless indifference to its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations;

280.    Violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon voluntarily and intentionally devising and/or participating with knowledge of or reckless indifference to its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations;

281.    Violations of the Florida commercial bribery statute, Fla. Stat. § 838.16, based upon agreeing to confer benefits on physicians while knowing that the physicians were subject to various statutory and common-law duties as physicians and with the intent that such benefits would influence the physicians to violate those duties;

282.    Violations of the Florida Communications Fraud Act, Fla. Stat. § 817.034(4)(a), based upon engaging in a scheme to defraud Uber and others and obtaining property thereby;

283.    Violations of the Florida Communications Fraud Act, Fla. Stat. § 817.034(4)(b), based upon engaging in a scheme to defraud Uber and others and, in furtherance of that scheme, communicating with Uber and others with intent to obtain property from them;

284.    Violations of the Florida insurance fraud statute, Fla. Stat. § 817.234(1)(a), based upon presenting or causing to be presented written or oral statements as part of, or in support of, claims for payments or other benefits pursuant to an insurance policy, knowing that such statements contained false, incomplete, or misleading information concerning facts or things material to such claims;

83

285. Violations of the Florida insurance fraud statute, Fla. Stat. § 817.234(2)(a), based upon the knowing and willful assistance, conspiracy, or urging by licensed medical practitioners for insured parties to fraudulently violate provisions of Section 817 or provisions of Part XI of Chapter 627;

286. Violations of the Florida insurance fraud statute, Fla. Stat. § 817.234(8)(a), based upon soliciting or causing to be solicited business from persons involved in motor vehicle accidents for the purpose of making, adjusting, or settling motor vehicle tort claims or claims for personal injury protection benefits while intending to defraud Uber and others; and

287. Violations of the Florida insurance fraud statute, Fla. Stat. § 817.234(9), based upon organizing, planning, or knowingly participating in intentional motor vehicle crashes or schemes to create documentation of motor vehicle crashes that did not occur for the purpose of making motor vehicle tort claims or claims for personal injury protection benefits.

288. Defendant knowingly and willfully associated with the enterprise and conducted or participated in the conduct of the enterprise's affairs, through a pattern of criminal activity.

289. Uber has been injured in its business and property by reason of the above-described conduct.

290. By reason of its injury, Uber is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to Fla. Stat. § 772.104.

## COUNT XII
### Florida RICO Conspiracy (Fla. Stat. § 772.103(4))
### (Against All Defendants)

291. Uber incorporates herein by reference each and every allegation in paragraphs 1 through 178 above.

292. For at least the time period referenced herein, Defendants did unlawfully, knowingly, and intentionally combine, conspire, and agree together with each other, and with

others whose names are known or unknown, to conduct and/or participate, directly and/or indirectly, in the conduct of the affairs of each enterprise identified above through a pattern of criminal activity set forth herein in violation of Fla. Stat. § 772.103(4).

293. This pattern of criminal activity in which the Defendants intentionally conspired to engage involved the specific acts as described in detail in this Complaint constituting wire fraud in violation of 18 U.S.C. § 1343, mail fraud in violation of 18 U.S.C. § 1341, commercial bribery in violation of Fla. Stat. § 838.16, fraud in violation of Fla. Stat. § 817.034(4)(a), communications fraud in violation of Fla. Stat. § 817.034(4)(b), insurance fraud in violation of Fla. Stat. § 817.234(1)(a), insurance fraud in violation of Fla. Stat. § 817.234(2)(a), insurance fraud in violation of Fla. Stat. § 817.234(8)(a), and insurance fraud in violation of Fla. Stat. § 817.234(9).

294. All of these predicate acts constituted "criminal activity" as defined in Fla. Stat. § 772.102(1).

295. The overall objective of the conspiracy was to defraud Uber and others by generating and submitting fraudulent billing and creating a false basis for personal injury lawsuits.

296. Each Defendant either agreed on the overall objective of the conspiracy or agreed to commit personally two of these predicate acts.

297. Uber has been injured in its business and property by reason of the above-described conduct.

298. By reason of its injury, Uber is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to Fla. Stat. § 772.104.

## COUNT XIII
### Violations of Florida's Deceptive and Unfair Trade Practices Act
### (Fla. Stat. §§ 501.201-501.213)
### (Against the Medical Provider Defendants)

299.    Uber incorporates herein by reference each and every allegation in paragraphs 1 through 178 above.

300.    At all material times, the Medical Provider Defendants were engaged in "trade or commerce" within the meaning of Fla. Stat. §§ 501.204(1) and 501.203(8).

301.    The Medical Provider Defendants committed "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," § 501.204(1), in violation of FDUTPA. See Fla. Stat. §§ 501.201-501.213.

302.    The Medical Provider Defendants' deceptive acts and practices included knowingly billing for services that either were not performed, were a result of improper patient referrals, were documented by falsified and fabricated records, or were medically unnecessary, which constitute false, incomplete, and misleading statements made while "knowing that such statement contains any false, incomplete, or misleading information concerning any fact or thing material to such claim" in violation of the Florida Insurance Fraud Statute. Fla. Stat. § 817.234(1)(a)(1).

303.    Florida Statutes § 626.9541(1)(u) also expressly defines as unfair or deceptive an act or practice where a physician knowingly causes to be presented to any insurer a false claim for payment.

304.    The Medical Provider Defendants' violations of Fla. Stat. § 817.234 and Fla. Stat. § 626.9541 are *per se* violations of the FDUTPA.

305.    Accordingly, this conduct is *per se* unfair or deceptive under FDUTPA. *See* Fla. Stat. § 501.204(1).

306.     The Medical Provider Defendants' conduct was deceptive as it was likely to, and did in fact, mislead Uber, while acting reasonably under the circumstances, to Uber's detriment by misrepresenting the lawfulness and medical necessity of the charges leading to Uber's payment of claims.

307.     The Medical Provider Defendants' above-described conduct was unfair as it was contrary to public policy, unconscionable, immoral, unethical, oppressive, and unscrupulous, and produced no benefits to consumers or competition.

308.     Uber has been injured in its business and property due to the Medical Provider Defendants' deceptive and unfair practices, leading the Medical Provider Defendants to be liable to Uber for damages and an award of attorney's fees pursuant to Fla. Stat. § 501.2105(1).

**COUNT XIV**
**Unjust Enrichment**
**(Against the Medical Provider Defendants)**

309.     Uber incorporates herein by reference each and every allegation in paragraphs 1 through 178 above.

310.     The Medical Provider Defendants have been and will continue to be unjustly enriched by benefits received pursuant to the fraudulent scheme, including through payments derived directly or indirectly from the Law Firm Defendants. Such benefit was received at Uber's expense given that Uber has been required to incur substantial legal expense as a result of the scheme.

311.     Principles of equity and good conscience require restitution of any such benefits received by the Medical Provider Defendants.

312.     Uber demands judgment against the Medical Provider Defendants, jointly and severally, for restitution of all such benefits received.

## PRAYER FOR RELIEF

1.      For general damages according to proof at trial, trebled according to statute;

2.      For restitution;

3.      For prejudgment interest;

4.      For reasonable attorneys' fees and costs;

5.      For punitive damages;

6.      For equitable relief as appropriate pursuant to applicable law, including but not limited to issuance of a temporary restraining order, a preliminary and permanent injunction, disgorgement, imposition of a constructive trust, and appointment of a monitor and/or receiver;

7.      For such other relief as the Court may deem appropriate.

Dated: June 11, 2025

Respectfully submitted,

GELBER SCHACHTER & GREENBERG, P.A.

By: */s/ Gerald E. Greenberg*

Gerald E. Greenberg (Florida Bar No. 440094)
Alessandra M. Siblesz (Florida Bar No. 1024843)
One Southeast Third Avenue
Suite 2600
Miami, Florida 33131-1715
Direct: (305) 728-0953
Main: (305) 728-0950
Fax: (305) 728-0951

David W.T. Daniels (*pro hac vice* application forthcoming)
Francys M. Guevara Sanchez (Florida Bar No. 1056086)
Perkins Coie LLP
700 Thirteenth Street NW
Washington, DC 20005-3960
Tel: +1.202.654.6200
Fax: +1.202.654.6211
DDaniels@perkinscoie.com
FGuevara@perkinscoie.com

David Massey (*pro hac vice* application forthcoming)
Benjamin Estes (*pro hac vice* application forthcoming)
Perkins Coie LLP
1155 Avenue of the Americas, 22nd Floor
New York, NY 10036-2711
Tel: +1.212.262.6900
Fax: +1.212.977.1649
DMassey@perkinscoie.com
BEstes@perkinscoie.com

## JURY DEMAND

Uber demands a trial by jury on all issues so triable.


Dated: June 11, 2025

Respectfully submitted,

GELBER SCHACHTER & GREENBERG, P.A.


By: */s/ Gerald E. Greenberg*
    Gerald E. Greenberg (Florida Bar No. 440094)
    Alessandra M. Siblesz (Florida Bar No. 1024843)
    One Southeast Third Avenue
    Suite 2600
    Miami, Florida 33131-1715
    Direct: (305) 728-0953
    Main: (305) 728-0950
    Fax: (305) 728-0951

    David W.T. Daniels (*pro hac vice* application forthcoming)
    Francys M. Guevara Sanchez (Florida Bar No. 1056086)
    Perkins Coie LLP
    700 Thirteenth Street NW
    Washington, DC 20005-3960
    Tel: +1.202.654.6200
    Fax: +1.202.654.6211
    DDaniels@perkinscoie.com
    FGuevara@perkinscoie.com

    David B. Massey (*pro hac vice* application forthcoming)
    Benjamin Estes (*pro hac vice* application forthcoming)
    Perkins Coie LLP
    1155 Avenue of the Americas, 22nd Floor
    New York, NY 10036-2711
    Tel: +1.212.262.6900
    Fax: +1.212.977.1649
    DMassey@perkinscoie.com
    BEstes@perkinscoie.com

# **<u>Appendix A</u>**

| Name | Role | Staged Accident Number(s) | Notes/Description |
|---|---|---|---|
| Andreina C. Moros | Claimant | 5 | Passenger, lead car |
| Andy Loynaz | Law Firm Defendant | 1, 2, 3, 4, 5 | Represented claimants in staged accidents |
| Ania Clemente | Claimant | 3 | Passenger, lead car |
| Blanca Bruzon | Medical Provider Defendant | 1, 2, 3, 4 | River Medical Center employee; false certifications |
| Carlos Rafael Suarez Lorenzo | Claimant | 1 | Passenger, lead car |
| Carolina Correa | Claimant | 2 | Passenger, lead car |
| Castor Garcia Siverio | Medical Provider Defendant | 2 | River Medical Center employee; false certifications |
| Daniel Perez Delgado | Driver Defendant | 3 | Colliding car driver |
| Dany Arencibia Cruz | Claimant | 2 | Driver, lead car |
| Diana Morales | Medical Provider Defendant | 1, 2, 3, 4 | Professional of South Florida therapist; fraudulent physical therapy |
| Diosvany Iriarte Blanco | Claimant | 3 | Driver, lead car |
| Emilio Mederos | Claimant | 2 | Passenger, lead car |
| Flagler Diagnostic Center Inc. | Medical Provider Defendant | 1, 2, 3, 4, 5 | Provided unnecessary diagnostics and treatments |
| Janny Oceguera Medina | Claimant | 4 | Passenger, lead car |
| Joan E. Castrillo | Claimant | 5 | Passenger, lead car |
| King Collision | Body Shop | 1, 2, 5 | Cars taken here had manufactured damage |
| Law Group of South Florida, LLC | Law Firm Defendant | 1, 2, 3, 4, 5 | Represented claimants in staged accidents |
| Liday Morejon Collazo | Claimant | 3 | Passenger, lead car |
| Luis Miguel Rodriguez Aragon | Claimant | 1 | Passenger, lead car |
| Manolo Loaces | Driver Defendant | 2 | Colliding car driver |
| Marianela Alejo Ruiz | Claimant | 4 | Passenger, lead car |
| Nahir Fraga | Medical Provider Defendant | 2, 3, 4 | River Medical Center employee; false certifications |

i

| Name | Role | Staged Accident Number(s) | Notes/Description |
|---|---|---|---|
| Nelson Morey Gomez | Driver Defendant | 5 | Colliding car driver |
| Oscar Jose Valerio Padilla | Driver Defendant; Claimant | 1, 5 | Colliding car driver (Staged Accident 1), lead car driver (Staged Accident 5) |
| Pedro Garcia Trelles | Claimant | 4 | Driver, lead car |
| Professional of South Florida Inc. | Medical Provider Defendant | 1, 2, 3, 4 | Provided fraudulent physical therapy |
| River Medical Center, Inc. | Medical Provider Defendant | 1, 2, 3, 4 | Provided initial intake, false diagnoses, referrals |
| Roberto Fleites Ruiz | Claimant | 1 | Driver, lead car |
| Steven Burack | Medical Provider Defendant | 1, 2, 3, 5 | Flagler Diagnostic employee; administered unnecessary injections |
| Xenia Hernandez | Lawyer | 2 | Took over representation of claimant |
| Yanes Body Shop | Body Shop | 1, 3, 4 | Cars taken here had manufactured damage |
| Yeni Zamora Gil | Claimant | 5 | Passenger, lead car |
| Yuniesky Diaz Valdivie | Driver Defendant; Colliding Car Passenger | 4, 5 | Colliding car driver (Staged Accident 4), colliding car passenger (Staged Accident 5) |
| Yutmila Yamiraky Gutierrez Camejo | Claimant | 3 | Passenger, lead car |

# **<u>Appendix B</u>**

**<u>Staged Accident 1</u>**: *Fleites v. Valerio Padilla*, No. 2024-009400-CA-01 (Fla. 11th Cir. Ct.)

**<u>Staged Accident 2</u>**: *Arencibia Cruz v. Loaces*, No. 2024-009733-CA-01 (Fla. 11th Cir. Ct.)

**<u>Staged Accident 3</u>**: *Iriarte Blanco v. Perez Delgado*, No. 2024-019168-CA-01 (Fla. 11th Cir. Ct.)

**<u>Staged Accident 4</u>**: *Garcia Trelles v. Diaz Valdivie*, No. 2024-022003-CA-01 (Fla. 11th Cir. Ct.)